**In re CENDANT CORPORATION SECURITIES LITIGATION.**

**No. CIV. 98–1664(WHW).**

United States District Court,
D. New Jersey.

Aug. 15, 2000.

Dennis J. Block, Cadwalader Wickersham & Taft, New York City.

James E. Lyons, Thomas Stevens, Skadden, Aps, Slate, Meagher & Flom, LLP, Francisco, CA.

Carl Greenberg, Budd Larner Gross Rosenbaum Greenberg & Sade P.C., Short Hills, NJ.

Steven S. Radin, Matthew S. Hawkins, Sills Cummis Radin Tischan Epstein & Gross, Newark, NJ.

Greg A. Danilow, Weil, Gothshal & Manges LLP, New York City.

Richard J. Schaeffer, Dornbush Mensch Mandelstam & Schaeffer, New York City.

Donald A. Robinson, Robinson Lapidus & Livelli, Newark, NJ.

Gary P. Naftalis, Kramer Levin Naftalis & Frankel, New York City.

Samuel Kadet, Skadden, Arps, Slates, Meagher & Flom LLP, New York City.

Herbert Jay Stern, Stephen M. Greenberg, Stern & Greenberg, Roseland, NJ.

James G. Kreissman, Jacob S. Pultman, Simpson Thacther & Barlett, New York City.

Dennis P. Orr, Mayer Brown & Platt, New York City.

Douglas S. Eakeley, Lowenstein Sandler PC, Roseland, NJ.

Alan N. Salpeter, Caryn L. Jacobs, Mayer, Brown & Platt, Chicago, IL.

Robert G. Cohen, William P. Hammer, Jr., Ernst & Young LLP, New York City.

James M. Altman, George B. Yankwitt, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City.

William F. Maderer, Saiber Schlesinger Staz & Goldstein, Newark, NJ.

Helen Gradd, Daniel E. Reynolds, Lankler Siffert & Wohl LLP, New York City.

Thomas G. Griggs, Edwards & Caldwell, Hawthorne, NJ.

Ronald L. Bernstein, Gretchen Baumgardner, Douglas W. Greene, Perkins Coie LLP, Seattle, WA.

Daniel J. Beller, Paul, Weiss, Rifkind, Wharton & Garrison, New York City.

Max W. Berger, Daniel L. Berger, Jeffrey N. Leibell, Bernstein Litowitz Berger & Grossmann LLP, New York City.

Charles H. Landesman, Kearney, NJ.

I. Walton Bader, Bader and Bader, White Plains, NY.

James N. Benedict, Clifford Chance Rogers & Wells, New York City.

Robert J. Fettweis, Roth & Fettweis, Newark, NJ.

Edward J. Dauber, Greenberg Dauber Epstein & Tucker, Newark, NJ.

Eric Tunis, Orange, NJ.

James A. Plaisted, Walder Sondak & Brogan, P.A., Roseland, NJ.

Henry D. Gradstein, Joel M. Kozberg, Eileen M. Cohn, Gradstein, Luskin & Van Dalsem, P.C., Los Angeles, CA.

James C. Gulotta, Jr., Stone, Pigman, Walther, Whittman & Mutchinson, New Orleans, LA.

Margaret E. Haering, Hurwitz & Sagarin, LLC, Milford, CT.

Michael J. Pucillo, Burt & Pucillo, West Palm Beach, FL.

George Vuoso, Gordon, Altman, Butkowsky, Weitzen, New York City.

Bruce E. Gerstein, Barry S. Taus, Brett Cebulash, Garwin, Bronzaft, Gerstein & Fisher, New York City.

David M. Taus, Francis J. Devito, P.A., Hackensack, NJ.

Elwood S. Simon, John P. Zuccarini, Elwood S. Simon & Associates, P.C., Birmingham, MI.

Michael H. Schaalman, Paul D. Bauer, Quarles & Brady LLP, Milwaukee, WI.

D.Greg Durbin, McCormick Barstow Sheppard Wayte & Carruth LLP, Fresno, CA.

James Moyle Clifford, Chance Rogers & Wells, New York City.

Gerald J. Rodeos, Leonard Barrack, Barrack, Rodos & Bacine, Philadelphia, PA.

Robert A. Hoffman, Barrack, Rodoes & Bacine, Haddonfield, NJ.

Seth R. Lesser, Bernstein Litowitz, Berger & Grossman, Hackensack, NJ.

Joel M. Leifer, Joel M. Leifer & Associates, New York City.

Arthur N. Abbey, Jill S. Abrams, Abbey, Gardy & Squitieri, LLP, New York City.

Allyn Z. Lite, Joseph J. DePalma, Lite DePalma Greenberg & Rivas, LLC, Newark, NJ.

Andrew L. Barroway, Schiffrin Craig & Barroway, LLP, Bala Cynwyd, PA.

Joseph Sacca, Jonathan J. Lerner, Skadden, Arps, Slates, Meagher & Flom, New York City.

Lisa C. Cohen, Schindler Cohen & Hochman, New York City.

Jonathan D. Thier, Cahill Gordon & Reindel, New York City.

Andrew R. Jacobs, Michael E. Coslet, Fitzsimmons Ringle & Jacobs, P.C., Newark, NJ.

Melvin Brosterman, Lawrence Greenwald, Stroock Stroock & Lavan, LLP, New York City.

David Sorokoff, Deloitte & Touche, New York City.

James J. McGuire, White & Case, New York City.

Richard L. Klein, Wilkie Farr & Gallagher, New York City.

Thomas G. Shapiro, Shapiro, Iiaber & Urmer, Boston, MA.

Myron D. Rumeld, Proskauer Rose LLP, New York City.

Steven Pontell, Verde Steinberg & Pontell, Fort Lee, NJ.

Howard Sirota, Sirota & Sirota, New York City.

Gerald Palmer, Ricky Shackelford, Jones Day, Los Angeles, CA.

C. Benjamin Nutley, Kendrick & Nutley, San Diego, CA.

Stuart Wechsler, New York City.

Paul Rothstein, Gainesville, FL.

Lawrence Schonbrun, Berkeley, CA.

Corporation Counsel City of N.Y. Law Dept., New York City.

## OPINION

WALLS, District Judge.

Pursuant to Federal Rule of Civil Procedure 23(e), Lead Plaintiffs, the New York State Common Retirement Fund ("NYSCRF"), the California Public Employees' Retirement System ("CalPERS") and the New York City Pension Fund ("NYCPF"), move for (i) approval of two settlements, one with Cendant Corporation ("Cendant") and the HFS Individual Defendants named below, and one with Ernst & Young LLP ("E & Y"), and (ii) approval of the Plan of Allocation of the Net Settlement Fund. The Cendant settlement provides for a payment to the class of $2,851,500,000 in cash, provides for additional payment to the class from Cendant and the HFS Individual Defendants in the event they recover damages in their suits against E & Y—50% of any recovery—and imposes certain corporate governance changes on Cendant. The E & Y settlement provides for a cash payment of $335,000,000 to the class. For the reasons stated, the settlements and Plan of Allocation are approved.

### A. The Action

Cendant was formed by the merger of CUC International, Inc. ("CUC") and HFS Incorporated ("HFS") on December 17, 1997. CUC, the surviving corporation, was renamed Cendant after the merger. Holders of HFS common stock were issued shares of CUC common stock pursuant to a Registration Statement dated August 28, 1997 ("Registration Statement")

and a Joint Proxy Statement/Prospectus. Am. Compl. ¶ 33.

On March 31, 1998, Cendant filed its Form 10–K Annual Report with the SEC including its 1997 financial statements. Two weeks later, after the close of the stock market on April 15, 1998, Cendant announced that it had discovered accounting irregularities in certain former CUC business units. As a result, it announced that it expected to restate its annual and quarterly financial statements for 1997 and possibly for earlier periods as well. The next day, Cendant's stock fell 47%, from $35–5/8 to $19–1/16 per share. Shareholder suits were then filed in this and other districts against Cendant, its officers and directors, and other parties including E & Y. E & Y had acted as CUC's independent public accountant from 1983 through the formation of Cendant, and post-merger audited the financial statements of Cendant Membership Services ("CMS"),[1] a wholly-owned subsidiary of Cendant, for the year ended December 31, 1997. These financial statements of CMS were consolidated into Cendant's financial statements and included in Cendant's Form 10–K for the 1997 fiscal year. On July 14, 1998, Cendant announced that it would also restate CUC's annual and quarterly financial statements for 1995 and 1996. Following this announcement, Cendant's stock fell by another 9% to $15–11/16 per share. Finally, on August 28, 1998, Cendant filed with the SEC a report prepared by Willkie Farr & Gallagher ("WF & G"), the law firm it had engaged to perform an independent investigation, which disclosed, among other things, that Cendant would restate its 1995, 1996, and 1997 financial statements by approximately $500 million. Cendant's stock then fell 11% to $11–5/8 on August 31, 1998, the first trading day after Cendant's disclosure of the audit report.

Following the selection of Lead Plaintiffs and approval of Lead Counsel (the process is addressed in companion opinion discussing Lead Counsel's fee request), on December 14, 1998, Lead Plaintiffs filed an amended and consolidated class action complaint on behalf of all persons and entities who purchased or acquired Cendant or CUC publicly traded securities, excluding PRIDES, during the period of May 31, 1995 through August 28, 1998 (the "class period"), and were injured thereby. Concurrently, plaintiffs filed a motion for class certification, granted on January 27, 1999.

The Amended Complaint named as defendants Cendant, E & Y, and individual officers and directors of Cendant, CUC, and HFS. Lead Plaintiffs alleged that defendants Walter A. Forbes, E. Kirk Shelton, Christopher K. McLeod, Cosmo Corigliano, and Anne M. Pember, officers of CUC before the merger, reviewed or were aware of the false and misleading statements alleged in the complaint, and "were in a position to control or influence their contents or otherwise cause corrective or accurate disclosures to have been made." Am. Compl. ¶¶ 16–17. The complaint asserted that the following defendants, together with defendants Walter Forbes, Shelton, and McLeod, were members of CUC's Board of Directors before the merger, signed the Registration Statement, and were named therein as directors of Cendant upon the completion of the merger: Burton C. Perfit, T. Barnes Donnelley, Stephen A. Greyser, Kenneth A. Williams, Barlett Burnap, Robert R. Rittereiser, and Stanley M. Rumbough, Jr. *Id.* at ¶ 18 (all of the named officers and directors of CUC are referred to collectively as the "CUC Individual Defendants"). The following defendants, except Scott Forbes, were directors of HFS before the merger and were named in the Registration Statement as directors of

---

**1.** Simultaneously with the Merger, all of the businesses formerly operated by CUC and all of CUC's assets were transferred to CUC Membership Services, Inc. On December 29, 1997, CUC Membership Services, Inc., changed its name to Cendant Membership Services.

Cendant upon the completion of the merger: Henry R. Silverman, John D. Snodgrass, Michael P. Monaco, James E. Buckman, Scott E. Forbes, Steven P. Holmes, Robert D. Kunisch, Leonard S. Coleman, Christel DeHaan, Martin L. Edelman, Brian Mulroney, Robert E. Nederlander, Robert W. Pittman, E. John Rosenwald, Jr., Leonard Schutzman, and Robert F. Smith (collectively, the "HFS Individual Defendants"). Scott Forbes served as the Senior Vice President–Finance of HFS and then Cendant from August 24, 1993 to April 15, 1998, and later the Executive Vice President and Chief Accounting Officer of Cendant.

Plaintiffs claimed that defendants made several materially false and misleading statements during the class period. Plaintiffs alleged that a number of CUC and Cendant's filings with the SEC from June 1995 through April 1998 were materially false and misleading as were their press releases from May 31, 1995 through June 2, 1998 in which they announced their quarterly and annual earnings. Am. Compl. ¶¶ 66–67. These press releases and SEC filings, according to plaintiffs, contained or incorporated by reference Cendant and CUC financial statements that were not prepared in conformity with Generally Accepted Accounting Principles ("GAAP") and contained other assertions that were materially false and misleading. Am. Compl. ¶¶ 68–82. In particular, plaintiffs alleged that Cendant and CUC overstated their revenues, net income, and operating income for the 1995, 1996, and 1997 fiscal years through various improper accounting practices. These included manipulation of merger reserves (reserves created which consist of the anticipated future costs of a business combination), irregular revenue recognition practices, CUC's improper accounting for membership cancellations, as well as a number of other improper accounting practices by CUC and its subsidiaries including Comp–U–Card. Am. Compl. ¶¶ 71–78.

In addition, plaintiffs asserted that the August 28, 1997 Registration Statement and the Joint Proxy Statement/Prospectus were materially false and misleading because of the financial statements incorporated by reference therein, misrepresentations contained in the Merger Agreement which was an appendix to the Joint Proxy Statement/Prospectus, and misrepresentations regarding the "due diligence" conducted by HFS in connection with the merger. Am. Compl. ¶¶ 86–102. The complaint further maintained that E & Y failed to audit CUC's annual and quarterly reports for 1995, 1996, and 1997 in accordance with Generally Accepted Auditing Standards ("GAAS") and review standards established by the American Institute of Certified Public Accountants (the "AICPA"). Am. Compl. ¶ 7. Plaintiffs claimed that E & Y's misrepresentations included: its assertions in its certifications that it had audited CUC's financial statement in accordance with GAAS; that it had planned and performed those audits to obtain reasonable assurance that the financial statements were free of material misstatements; that in its opinion, CUC's financial statements presented CUC's financial position fairly, in conformity with GAAP; and that its audits provided a "reasonable basis" for its opinions. Am. Compl. ¶ 134.

Plaintiffs plead that all defendants violated § 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k; that Cendant violated § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2); that defendants Walter Forbes, Shelton, McLeod, and Corigliano violated § 15 of the Securities Act, 15 U.S.C. § 77o; that defendants Cendant, Walter Forbes, Shelton, McLeod, Corigliano, Pember, Silverman, Snodgrass, Monaco, Buckman, Scott Forbes, and E & Y violated § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5; that defendants Walter Forbes, Shelton, McLeod, Corigliano, Pember, Silverman, Snodgrass, Monaco, Buckman, and Scott Forbes vio-

lated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); that defendants Walter Forbes, Shelton, McLeod, Corigliano, Silverman, Snodgrass, and Buckman violated § 20A of the Exchange Act, 15 U.S.C. § 78t–1; and that Cendant, the HFS Individual Defendants except Scott Forbes, and the CUC Individual Defendants except Pember violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a–9, 17 C.F.R. § 240.14a–9.

Lead Plaintiffs successfully defended this Amended Complaint against defendants' motions to dismiss. In July 1999, the Court denied all motions except for E & Y's to dismiss plaintiffs' Section 10(b) and Rule 10b–5 claims against it for stock purchases made after April 15, 1998. *See In re Cendant Corp. Litig.*, 60 F.Supp.2d 354 (D.N.J.1999).

*B. Lead Plaintiffs' Argument In Support of Settlement*

1. The Settlements

Cendant's $2.8 billion payment represents approximately 37% of Lead Plaintiffs' estimate of reasonable compensation damages of $8.5–8.8 billion,[2] and over 58% of Cendant's estimated damages. Joint Decl. ¶ 131. This settlement provides for potential additional recovery for the class of 50% of any net recovery that Cendant or the HFS Defendants receive in any litigation against E & Y. Further, through the settlement Cendant is bound to institute significant corporate governance improvements. In exchange, the class agrees to release: "all claims that were, or could have been, brought against the CUC Defendants (who were not parties to the Stipulation), Cendant, and the HFS Individual Defendants." Lead Counsel continue:

> Inclusion of the CUC Individual Defendants was a non-negotiable condition of the Cendant Settlement. Cendant insisted that (i) it did not want lingering

cross or indemnity claims against the Company made by any CUC Individual Defendant; and (ii) it was necessary to preserve claims against those individuals, who are not settling parties, and against the liability insurance policies covering those individuals, to the maximum extent allowed by law. Lead Plaintiffs and Lead Counsel believe that such a condition was reasonable, and agreed to it in order to obtain the outstanding recovery for the Class.

The entire amount of the Cendant settlement will earn interest for the class beginning on the earlier of August 20, 2000 or five days after settlement approval. The amount will be paid into an escrow account within 120 days after the approval becomes final.

The E & Y settlement of $335 million "is the largest amount ever paid by an accounting firm in a securities class action." Brf. at 1. It earns interest for the benefit of the class as of April 14, 2000. The settlement amount and any interest will be deposited into escrow no later than 90 days after settlement approval.

2. The Plan of Allocation

The plan calculates loss amounts per Cendant share, note, or option for each day in the class period, based on the amount of artificial inflation caused by CUC and Cendant's issuance of materially false and misleading financial statements and other financial information. Each shareholder's settlement payment, then, depends on the date his or her shares were acquired (and, if applicable, sold). *See* Section G, below.

Those who obtained Cendant's publicly traded securities after April 15, 1998 will not receive payment from the E & Y settlement amount because the Court has dismissed all claims against E & Y for class members who purchased after this date.

---

**2.** The aggregate damages were initially set as $8.5 billion. In post-fairness hearing briefing, the amount was adjusted upward to $8.8 billion.

These purchasers, however, will receive payment from the Cendant settlement.

Further, the plan recognizes Section 11 claims of those who acquired Cendant common stock in exchange for HFS shares at merger. The interests of these class members will be calculated under the damages provision of Section 11. *See* n. 10. If Section 11 damages are greater than losses determined under Section 10(b), a plaintiff will receive Section 11 statutory damages, if not, he or she will receive Section 10(b) damages.

### 3. Assessment

■ Lead Plaintiffs assert that the proposed settlements are fair, reasonable and adequate and should be approved by the Court. *See In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768 (3d Cir.1995). Factors to be considered are:

> (1) the complexity, expense, and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975); *see also* Coffee Decl. ¶ 17.

In regard to the first factor, Lead Plaintiffs assert that the claims "involve[ ] numerous complex legal and technical accounting issues." Additionally, "because this case settled prior to the taking of depositions and pre-trial preparation, there is no question that continued litigation would have greatly increased the expense and duration of this action." Brf. at

13; *see also In re Ikon Office Solutions, Inc. Securities Litig.,* 194 F.R.D. 166 (E.D.Pa.2000), *cited in* Coffee Decl. ¶ 17 ("in the absence of a settlement, this action will likely extend for months or even years longer"). Finally, even if a larger judgment were received at trial, additional delay would likely occur through the appellate process.

The second factor is linked to the number of objectors to settlement. Here, out of 478,000 notices of settlement sent, three class members object to the settlements (Tere Throenle, Betty Duncan (to the E & Y settlement) and Robert and Janice Davidson (objecting on behalf of themselves and various trusts)). An additional class member objects to the Plan of Allocation (Ann Mark). Two other objections by non-class members were filed, one by Martin Deutch, derivative action plaintiff, and the other by the State Board of Administration of Florida. Lead Plaintiffs state that the four class member objectors "collectively have losses constituting less than 1/10,000 of 1% of the Class's damages." Reply Brf. at 2. The objectors' holdings are described:

- Tere Throenle purchased 100 shares of Cendant stock on April 17, 1998 and lost approximately $600;
- Betty Duncan, trustee of the Esther J. Johnston Trust, bought an unspecified number of CUC 3% Notes and claims a $1,294 loss;
- The Davidsons, as individuals and trustees, received CUC stock in July 1996 when their business was merged into the company, "and by year end had sold over 80% of it for $635 million—most of that profit";
- Ann Mark exchanged 100 HFS shares for 240 CUC shares in the merger and also purchased 400 shares in the open market.

Lead Plaintiffs add "[p]erhaps most telling is the reaction of institutional investors to the settlements.... Here, not one of the over 1,700 institutional investors [who

owned between 78% and 98% of Cendant stock during the class period] in the Class has objected to the Settlements." *Id.* at 3. Lead Plaintiffs conclude: "The class's near unanimous support of the Settlements confirms the superior results achieved by Lead Plaintiffs and Lead Counsel." *Id.* at 3; *see also* Miller Decl. ¶ 16. The objections and Lead Plaintiffs' responses are discussed below.

The third factor looks to the stage of the proceedings. Here, Lead Counsel contend that they "conducted a thorough and efficient investigation and analysis" of all claims. As example, they hired a damages expert and an investment banking expert to evaluate Cendant's ability to contribute to settlement. *See* Joint Decl. ¶¶ 112–17. They conclude "this case had advanced to a stage where the parties 'certainly [had] a clear view of the strengths and weaknesses of their cases.'" Brf. at 16 (quoting *In re Warner Communications Securities Litig.*, 618 F.Supp. 735, 745 (S.D.N.Y.1985), *aff'd*, 798 F.2d 35 (2d Cir.1986)).

Lead Plaintiffs next address the fourth factor—the risks of establishing liability:

> While Lead Counsel believe there is substantial evidence to support the Class's claims ... the complexities and uncertainties of this litigation clearly warrant approval of the Settlements. In particular ... the claims against E & Y and all but two of the Individual Defendants were less [strong].

Brf. at 16–17. Moreover, because of the Private Securities Litigation Reform Act's prohibition against collection of damages in excess of a defendant's determined liability, "a key factor for Lead Plaintiffs and Lead Counsel was the proportion of liability a jury was likely to assess against Cendant, E & Y and the 28 Individual Defendants." *See* 15 U.S.C. § 78u–4(f); *see generally* The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 77k, 77l, 77z1, 77z–2, 78j–1, 78t, 78u, 78u–4, & 78u–5. Lead Plaintiffs add that the difficulty of establishing E & Y's liability is even greater due to defenses ac-

corded to accounting firms under the PSLRA. *See* Coffee Decl. ¶ 17(c). As for the director-defendants, "of the 28 Individual Defendants, 18 were non-employee, or 'outside' directors of Cendant who were named as defendants only on claims charging violations of Section 11 of the Securities Act and Section 14 of the Securities Exchange Act." Brf. at 18. And these outside director-defendants possess a "due diligence" defense. Joint Decl. ¶ 131. Moreover, the HFS inside directors could assert this defense to Section 11 and Section 14 claims. Finally, "[o]f the five CUC Individual Defendants who were not outside directors ... only [two] were identified by the Investigation as having played an active role" in the fraud. Brf. at 19.

With reference to the fifth factor, the risks of establishing damages, Lead Plaintiffs remark that Cendant and E & Y vigorously disputed plaintiffs' expert's conclusion that the maximum class damages total approximately $8.5 billion. Plaintiffs conclude that proof of damages at trial would, at best, result in a battle of experts with unpredictable results.

Although Lead Plaintiffs detail why defendants would be unable to withstand a greater judgment (the seventh settlement factor), their position can be summed up in three words—"Pennzoil vs. Texaco." In 1985, Pennzoil obtained an $11.1 billion judgment in Texas state court against Texaco for interference with contract. Texaco was unable to post bond for appeal equal to the entire amount. It instead sought bankruptcy protection and Pennzoil eventually agreed to accept a $3 billion settlement. Lead Plaintiffs allege that even if the maximum recovery were obtained at trial, Cendant would be unable to post the necessary bond for appeal, let alone pay the amount to the class.

Lead Plaintiffs next address the final factors concerned with the range of reasonableness of the settlement(s). They repeat that the current recovery is 37% of

their expert's maximum recoverable damages, which could rise if Cendant or the HFS Defendants obtain additional recovery from E & Y. They add that the recovery includes corporate governance reforms that "would not have been available remedies ... under the federal securities laws ... and were obtained without sacrificing any monetary award." Brf. at 24.

Plaintiffs' reply brief expands their argument that 37% of the maximum damages is a "superior result." Reply Brf. at 5. They refer to a study of 377 securities class action settlements between January 1991 and June 1996 made by the National Economic Research Association, Inc. ("NERA"), which "revealed that the average settlement comprises between 9% and 14% of plaintiffs' claimed damages." Denise Martin et al., National Econ. Research Ass'n, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions* 10–11 (NERA 1996). *See also In re Prudential Securities, Inc. L.P. Litig.*, MDL No. 1005, 1995 WL 798907 (S.D.N.Y.1995) (approving settlement of between 1.6% and 5% of claimed damages); *In re Crazy Eddie Securities Litig.*, 824 F.Supp. 320 (E.D.N.Y.1993) (settlement of between 6% and 10% of damages); *In re Michael Milken & Assocs. Securities Litig.*, 150 F.R.D. 57 (S.D.N.Y.1993) (7.5%).

Alternatively, they propose that reasonableness of settlements may be evaluated by determining the corporate payor's contribution as a percentage of its market capitalization. According to plaintiffs, Cendant's $2.85 billion contribution represents 21% of its 1999 average capitalization and 27% of its July 19, 2000 market capitalization. (Plaintiffs' full amount of damages—between $8.5 billion and $8.8 billion—represents approximately 95% of Cendant's market capitalization of $9.21 billion as of the close of trading August 10, 2000.) By contrast, mega-fund settlements which involved companies with capitalizations of over $1 billion ranged from 1% (*In re Waste Management, Inc.*, No. 97–7709, 1999 WL 967012 (N.D.Ill.1999)) to 7.6% (*In re Informix Corp. Securities Litig.*, No. 97–1289 (N.D.Cal.1999)) of total capitalization. Reply Brf. at 6–7. A securities case in the Eastern District of Pennsylvania, *In re Ikon Office Solutions, Inc. Securities Litig.*, 194 F.R.D. 166 (E.D.Pa. 2000), recently settled for 6.2% of IKON's average 1999 market capitalization of $1.8 billion and between 5.2% and 8.7% of over $1 billion in claimed damages.

Lead Plaintiffs add "a final yardstick in considering the quality of a settlement is how much was available from insurance to cover the claims." Here, they state that the $3.18 billion total settlement is 12 times available insurance coverage. In contrast, the NERA report determined that class actions settlements typically amount to 3.4 times total insurance proceeds. Reply Brf. at 7.

They then address approval of the Plan of Allocation, "governed by the same standards of review applicable to the approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Oracle Securities Litig.*, [1994–1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,355 at 90,446 (N.D. Cal. June 18, 1994) (Walker, J.). This plan is briefly explained above. Lead Plaintiffs, relying on the work of Forensic Economics, Inc., assert that this plan is fair, reasonable and adequate and should be approved.

### C. E & Y's Brief in Support

E & Y's brief in support of settlement focuses mainly on the risks of establishing liability and damages against it. In a preview of what will surely be argued in the Cendant–E & Y suit, the accounting firm stresses that it too was a victim of Cendant's fraud: "Plaintiffs would face daunting, and perhaps insurmountable, hurdles in attempting to prove at trial that E & Y should be liable for Cendant's admitted fraud." E & Y Brf. at 11. It agrees with Lead Plaintiffs that the estimation of damages at trial would lead to a battle of

experts. Further, it asserts that "E & Y's proportional share of plaintiffs' damages is exceedingly small." *Id.* at 13. In all other respects, E & Y agrees with Lead Plaintiffs' assertions regarding the reasonableness of settlement.

### D. Objectors to Settlement

#### Derivative Plaintiff

Derivative plaintiff, Martin Deutch, objects to the settlement both as a current shareholder whose interest in Cendant will allegedly be diminished as a result of settlement and as derivative plaintiff whose derivative claims will arguably be diminished by settlement.

He objects on the following grounds:

- The notice of settlement is defective because it does not inform shareholders that (a) certain derivative claims will be "compromised" and (b) contribution claims by Cendant against at least the HFS Individual Defendants will be barred.

- Approval of the settlement violates due process because it compromises certain derivative claims "even though the interests of the Derivative Plaintiff, the Company, and its current shareholders in those claims are not adequately represented in the class action."

- The settlement fails to allocate Cendant's payment to the class between Section 10(b) claims and Section 11 claims—critical for determining the value of remaining contribution claims if settlement occurs.

- The settlement is "grossly unfair to Cendant and its current shareholders because it likely eviscerates pending

state law derivative claims and contribution claims against individual defendants, without any payment by the individual defendants for the release of those claims."

- The settlement is an illegal indemnification.

These objections along with Deutch's motion to intervene to object to settlement under Federal Rule of Civil Procedure 24 are discussed in a separate opinion. *See In re Cendant Corp. Securities Litig.*, 109 F.Supp.2d 235 (D.N.J. 2000).

#### Davidsons

Class members Janice and Robert Davidson object to the settlement on behalf of themselves and as trustees of various trusts (collectively "the Davidsons").[3]

The Davidsons argue that given the size of their holdings, their objections "must be given considerable weight." Dav. Brf. at 4. Their first objection is that Lead Plaintiffs did not adequately represent their interests. They rely on the brief filed by Lead Counsel in a related dispute that contends that Lead Plaintiffs did not believe the Davidsons to be class members.[4] They assert that "[t]he failure of Class counsel to represent and protect the Davidsons' interests is reason enough to disapprove this Settlement." *Id.* at 6 (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 627–28, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). Alternatively, they contend that because they acquired shares in connection with the purchase of their business, to effectuate settlement the court must create a subclass to represent their status. *Id.*

---

**3.** The Davidsons moved in May 2000 to be excluded from the class. The Court ruled that their holdings fall within the class. *See In re Cendant Corp. Securities Litig.,* 194 F.R.D. 158 (D.N.J.2000). This ruling is on appeal.

**4.** The Davidsons' shares were held mainly in trusts created for the benefit of charities and

heirs. Lead Counsel previously argued that Janice and Robert Davidson should be excluded from the class as former CUC officers. They, however, did not argue that the trusts were excluded from the class. *See In re Cendant Corp. Securities Litig.,* 194 F.R.D. 158 (D.N.J.2000).

They also argue that the proposed settlement is not fair to the class as a whole because members are treated unequally. Here, the settlements and Plan of Allocation are based upon a fraud on the market theory and awards damages commensurate with such a theory. Damages under this theory, however, "have not been shown by the proponents of this Settlement to be the most appropriate for class members who did not receive their shares as a result of market transactions." *Id.* at 10. Further, "[t]he Plan of Allocation essentially assumes—without proving-that the fraudulent inflation in CUC's per share stock price increased constantly throughout the Class period. It therefore assumes in and out purchasers and sellers assumed no damages." *Id.* at 8. Moreover, "Shareholders who acquired their shares early in the class period and retained them are penalized in favor of latecomers." *Id.* at 11.

Additionally, the Davidsons maintain that the proceedings leading to settlement have been deficient as a matter of law because Lead Plaintiffs were chosen when the class consisted of purchasers between May 1997 and April 1998. The class was later opened to those who received shares as early as May 1995 (encompassing the Davidsons). Yet, the Davidsons were never offered Lead Plaintiff status.

Finally, they assert that the corporate governance concessions "are entitled to no weight in this Court's consideration of the Settlement because they provide only illusory benefit to the class members." *Id.* at 15.

After the hearing of June 28, 2000, the Court allowed the Davidsons to supplement their objections to the Plan of Allocation. They did so. Their objections and Lead Counsel's response are discussed in detail later.

*Duncan*

Betty Duncan, a member of the settlement class who held CUC Notes purchased on November 14, 1997 and sold on November 28, 1998, for loss of $1,294, objects to the settlement.

She first objects on behalf of non-institutional private purchasers. She claims that these "smaller" investors "have no commonality or identity of interest in terms of their financial capacity to sustain loss, their degree of investment diversification, or their level of sophistication as investors, with the designated Lead Plaintiffs." Dun. Brf. at 2.

She further objects that other than the unsupported declarations of Lead Counsel as to defendants' abilities to sustain larger settlements, "this Court has had no opportunity to receive relevant testimony from Lead Counsel's experts regarding the financial conditions, cash flows, or capacities to withstand greater judgments." *Id.* at 4. Moreover, she specifically disagrees with class counsel's conclusion that E & Y's payment was reasonable where the firm's "culpability is clear." *Id.* at 5. She takes issue with the settlement notice for two reasons (1) the notice does not inform class members of the tax consequences of the proposed settlements and (2) the notice is not understandable.

At the fairness hearing on June 28, 2000, the Court allowed Duncan to expand on her objections to the E & Y settlement. In her second submission, Duncan argues that Cendant's amended cross-claim against E & Y conclusively demonstrates the firm's liability to the plaintiff class.[5] She further asserts: "If E & Y is involved in this fraud, they are liable for the full $8.5 billion," thus the firm's payment should be at least equal to the $2.8 billion to be paid by Cendant. Dun. Supp. Brf. at

---

5. This Court previously declined to use allegations in a complaint filed by certain defendants in a related action to prove liability under the securities laws. *See In re Cendant Corp. Derivative Action Litig.*, 96 F.Supp.2d 394, 401–02 (D.N.J.2000) (declining to use allegations in complaint filed by HFS Defendants against E & Y to demonstrate Section 11 liability of the HFS Defendants).

5. She adds that E & Y can and should pay more and attacks plaintiffs' contention that the $335 million is "reasonable in light of the firm's financial resources available to satisfy a judgment." *Id.* at 6. Finally, she disputes that sufficient discovery into E & Y's alleged wrongdoing was conducted by Lead Counsel and urges the Court to (1) refuse to approve the settlement at this time because new evidence of E & Y's liability may surface as the United States Attorneys' Office conducts its investigation and (2) appoint new class counsel to prosecute the E & Y action.

### Throenle

Tere Throenle, a class member who purchased 100 shares of Cendant stock on April 17, 1998, objects to settlement. She initially claims that the Notice of Settlement was defective in that it denied class members access to crucial information. For example, each settling party did not include a statement which listed "issues on which the parties disagree." 15 U.S.C. § 78u–4(a)(7)(B)(ii). The notice only allegedly identified one risk of continued litigation—the PSLRA's proportionate liability restrictions. Throenle asserts that this "risk" is nonsense because proportionate liability restrictions exist only where a defendant has committed no knowing violation of the law. She argues that this case involves defendants' knowing violations of the securities acts.

She further alleges that the notice stated that additional information was on file with the Clerk of the Court but "the district court clerk flatly refused Throenle's requests for the brief supporting the proposed settlements."

In addition, Throenle maintains that Lead Plaintiffs have acted only in their own interests and have abandoned the claims of individual investors. She suggests that Lead Counsel may own interests in Cendant which compromises their ability to represent the class. She also contends that the corporate governance reforms will not benefit those who no longer own Cendant stock. As for the E & Y settlement, she states "Lead plaintiffs thus propose to trade their solid case against E & Y for half of a mediocre case they do not control." Brf. at 26.

She requests permission to conduct discovery focused on adequacy of representation in order to either create a subclass or appoint new Lead Plaintiffs and Counsel. Throenle also objects to the fee request, discussed in a companion opinion.

### Mark

Ann Mark objects to the Plan of Allocation on the following grounds:

- The plan fails to recognize that the Section 11 claims of former HFS shareholders are "materially stronger" than all other claims in the action.
- The Section 11 claims possessed by the former HFS shareholders are "virtually identical" to claims held by PRIDES shareholders who settled for nearly 100 cents on the dollar.
- The recent case of *Amchem Prods. v. Windsor*, mandates a strict analysis of competing interests in a class action settlement.

### Florida

The State Board of Administration of Florida and the Teachers Retirement System of Louisiana submit a letter urging the Court to extend the class opt-out deadline.[6] (These objecting parties are not included in the class settlement as they have already opted out and are pursuing their own actions against Cendant.) They also ask that in settlement the Court direct all

---

**6.** Florida's objection is phrased as a request to extend the opt-out deadline. As explained in *In re Cendant Corp. Securities Litig.,* 194 F.R.D. 158 (June 20, 2000), the Court will not extend the opt-out deadline absent a showing of excusable neglect under Federal Rule of Civil Procedure 6(b). Defendants object to Florida's request to hold records because Florida is not currently party to the Confidentiality Agreement signed in the main action. This agreement mandates the destruction of confidential records post-settlement.

parties to the action to "hold all evidentiary materials and not destroy them" until all related actions are concluded.

### E. Response to Objections

Lead Plaintiffs respond collectively to objections raised by Throenle, Duncan,[7] the Davidsons, and Mark. In reply to Throenle and Duncan's contention that the settlements are unfair because both defendants are allegedly capable of paying more, Lead Plaintiffs contend that the objections "misread the relevant standard for settlement approval," Reply Brf. at 8: "To conclude that the settlement is fair, a Court need not find that defendant paid the last dollar and can not come up with 'one additional cent, farthing or sou.'" Reply Brf. at 8.

Admittedly under *Girsh*, one relevant factor is whether defendant would be capable of sustaining a greater *judgment*, not greater *settlement. Girsh*, 521 F.2d at 157. Lead Plaintiffs rely on the declarations of counsel which detail investigations into Cendant and E & Y's ability to withstand greater judgment. *See, e.g.*, Joint Decl. ¶ 131, Supp. Joint Decl. ¶ 13–14 (detailing Lead Counsel's investigation into E & Y's ability to withstand judgment). They add that in order to fund this settlement, Cendant will have to *raise* money and has already retained the "services of two highly regarded financial advisors" for assistance. Reply Brf. at 8. Lead Plaintiffs amplify their concerns that Cendant would seek bankruptcy protection if it had to pay more—Texaco, for example, "had a much larger market capitalization and greater assets, net worth, revenues and cash flow than Cendant." They also refer to three other companies forced into bankruptcy by litigation: Manville Corporation (asbestos-related damages of up to $12.5 billion); A.H. Robins, Co. (Dalkon Shield litigation with damages of up to $4 billion) and Dow Corning Corporation (silicon breast implant litigation).

Lead Plaintiffs add that they fully examined E & Y's insurance coverage, financial condition, and the details of the Cap Gemini deal—a condition precedent to settlement. This transaction involved the sale of E & Y's consulting business to Cap Gemini, S.A., in mid-June 2000. According to plaintiffs, "it appears that the Cap Gemini deal does not result in large payments to E & Y's partners, but rather actually provides relatively little free cash to the partnership." Reply Brf. at 11. Moreover, they argue that "holding out in hopes of obtaining a greater judgment against E & Y would entail real risk" and this should be factored into consideration of E & Y's settlement. *See* Coffee Decl. ¶ 17(c) (discussing protections accorded to accounting firms under the PSLRA).

The Court permitted Duncan to submit additional briefing of her objections to the E & Y settlement, including the issue of whether E & Y could afford a greater payment to class. E & Y and Lead Plaintiffs responded to amplify their initial contention that all *Girsh* factors favor approval of the E & Y settlement: First, further prosecution against E & Y would be enormously complex—it would involve interviews of all Cendant and E & Y personnel involved in the preparation of the three annual audits and eight quarterly reviews of Cendant by E & Y; extensive use of experts; and the possibility that a trial jury would exonerate E & Y, *see In re Health Management, Inc.*, No.1996–889 (E.D.N.Y.) (jury found for auditor of company accused of accounting fraud because evidence indicated the company hid fraud from auditor). Lead Plaintiffs add the likely duration of any action would be years, especially if the Court accepts Duncan's argument that the case against E & Y should wait until any criminal investigations are concluded.

Second, Lead Plaintiffs and E & Y repeat that the class reaction is favorable and not one of the large institutional investors has questioned the fairness of the E &

---

7. E & Y also filed a response to issues raised by Duncan regarding its settlement.

Y settlement. Third, plaintiffs dispute Duncan's contention that insufficient discovery was conducted into E & Y's role in the alleged fraud: (a) Lead Counsel had access to and reviewed all exhibits to the Audit Committee Report with the assistance of a forensic accountant; (b) they also reviewed 32 boxes of documents produced by Cendant in its third document production; (c) the United States Attorneys' Office would undoubtedly have sought to stay depositions of any targets of its investigation pursuant to this Court's Order of July 30, 1999; (d) E & Y's financial capability to withstand a larger settlement was examined, "which, while not the determining factor in the amount of settlement, certainly was *a* factor in" accepting a settlement payment of $335 million, Reply at 8; and (e) documents prepared by the government and the SEC do not support Duncan's call to delay the E & Y settlement—they do not implicate the accounting firm but rather demonstrate that CUC senior management took steps to conceal fraud.

Fourth, the risks of establishing liability are great. "[S]uccessful cases against outside accounting firms [are] the exception." Reply at 13; *see, e.g., Health Management,* discussed above; *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441 (11th Cir. 1997) (verdict against outside accounting firm vacated on appeal). E & Y has at its disposal numerous admissions and documents of record that could be used to show that Cendant "manipulated corporate records to conceal the fraud from E & Y." Reply at 13. And E & Y also has a Section 11 defense that after reasonable investigation it had reasonable grounds to believe the Registration Statement was not misleading. E & Y concurs with Lead Plaintiff's analysis of the risks of establishing liability and adds that the recent guilty pleas of three former CUC employees only make plaintiffs' case more difficult: "the fact that these individuals went to such lengths to conceal their actions from CUC shows that E & Y did *not* participate in the fraud." E & Y Reply at 4. Moreover,

these employees all implicate more senior CUC executives which, according to E & Y, demonstrates how sophisticated the concealment was. *See* E & Y Reply at 5.

Fifth, Lead Plaintiffs expand on the potential damages of E & Y. According to plaintiffs, the total damage to pre-April 1998 class members is $6.2 billion (E & Y is not potentially liable to post-April 15 purchasers). This amount would have to be reduced by the amount paid these purchasers by Cendant—approximately $2.1 of the $2.85 billion settlement, leading to a figure of $4.1 billion. Alternatively, if Duncan's assertion that Cendant and E & Y are equally responsible for the fraud is followed, E & Y is potentially liable for only $3.1 of the $6.2 billion. Then, at trial, a jury would have to determine: (1) whether E & Y violated the securities laws; (2) what E & Y's percentage of liability is as compared to all persons (including Cendant, the 28 individual defendants, third-party defendants, and non-parties); and (3) whether E & Y knowingly violated the law. (Joint and several liability against E & Y is possible only if a knowing violation is found.)

Lead Plaintiffs conclude that in light of these risks, $335 million is an "exceptional" settlement—over 10% of the hypothetical liability of $3.1 billion if Duncan's assertion of equal liability is adopted. By comparison, plaintiffs state that in two recently settled cases, accounting firms paid less than 4% of damages allegedly attributable to their conduct. *See In re Informix Corp. Securities Litig.,* No.1997–1289 (N.D.Cal.); *In re Waste Management, Inc.,* No.1997–7709 (N.D.Ill.). E & Y also disputes Duncan's premise that E & Y and Cendant are "equally liable." It asserts that "E & Y's proportionate share of liability for the class's damages necessarily would be miniscule when compared to the confessed liability of Cendant and its officers." E & Y Reply at 9. Sixth, Lead Plaintiffs assert that Duncan misstates the standard used to evaluate a defendant's

ability to pay: "Under *G[i]rsh,* the ability to pay factor—which is one of many factors that a court should consider—goes to ability of defendant to pay a potential *judgment,* not the ability to pay more in settlement." And "[n]o one, including Duncan, seriously contends that E & Y would have been able to pay a judgment in that amount." Reply at 19. E & Y agrees and adds that "[h]ere, it is undisputed that any judgment against E & Y for any amount approaching the plaintiffs' full damages claim would be uncollectable." E & Y Reply at 10. Finally, counsel state that no further discovery is required, a full investigation has been conducted by Lead Counsel and should not be delayed to see what, if anything, develops in the criminal investigation to implicate E & Y. Duncan's objections are considered in the Court's analysis of the *Girsh* factors.

Lead Plaintiffs next address Mark and Throenle's arguments that 37% of the recovery is unfair because PRIDES settling class members allegedly received 100% of their losses. Initially they assert that "it is not a logical sequitur that a settlement of this case for less than 100%" is unfair or unreasonable. Reply Brf. at 12. They seek to distinguish the PRIDES settlement: (1) the CalPERS class damages are 25 times those suffered by the PRIDES class; (2) the recovery is 10 times the amount of the PRIDES settlement; (3) PRIDES were sold to the public just six weeks before the April 15, 1998 disclosure; (4) the PRIDES settlement was not a cash settlement but a "paper for paper" exchange; (5) the PRIDES claimants received no interest and CalPERS class members' claims will accrue interest until distribution; (6) PRIDES is a claims-made settlement where unclaimed shares revert to Cendant, here the entire amount will be distributed to class members; (7) the PRIDES settlement involved only Section 11 claims while this settlement involves Section 10(b) and Section 11 claims; and (8) the PRIDES settlement was for securities of uncertain value. Reply Brf. at 12. According to plaintiffs, while the PRIDES were priced at $11.71 each, they have actually traded at that amount for only 4 out of 65 days. As of June 14, 2000, they were valued at $7.25. "PRIDES claimants who still hold Rights today have a settlement representing only 60% of their damages." [8]

For these reasons, Lead Plaintiffs maintain that the PRIDES settlement cannot be used as a measure of reasonableness of this settlement; and, if used, the recovery rates are similar. *See* n. 8.

The Court agrees with most of the reasons stated by Lead Plaintiffs: The CalPERS settlement cannot be compared to the PRIDES settlement. In particular, the "paper for paper" exchange and the claims-made settlement differentiate the two. The Court does not agree with "present market" PRIDES valuation criticism for the exchange will not be realized until February 14, 2001, when PRIDES holders will be entitled to exchange their holdings for Cendant rights at a pre-determined exchange of $11.71, present market fluctuation regardless. *See In re Cendant Corp. Prides Litig.,* 51 F.Supp.2d 537, 540 (D.N.J.1999). But it is significant that CalPERS class members are, instead, receiving an immediate all-cash settlement with none of the settlement fund returning to Cendant.

█ Lead Plaintiffs next address Throenle's objection that the corporate governance changes were obtained in lieu of additional cash recovery for the class

---

**8.** Additionally, Lead Plaintiffs contend that if the Cendant recovery is broken down into Section 11 and Section 10(b) damages and adjusted to reflect the anticipated Section 11 recovery based on the Plan of Allocation (which finds that Section 10(b) damages are greater than Section 11 damages for nearly every trading day from April 15, 1998 through the end of the class period); and is further adjusted to take into account the 85% claim rate achieved in the PRIDES settlement, the recovery in the CalPERS action represents an approximately 52% recovery rate for class members on Section 11 claims. Reply Brf. at 14–15.

and state that "Throenle is simply making this up." The joint declaration of Lead Counsel reads "we advised Cendant's outside counsel, and James E. Buckman, Cendant's General Counsel, that there would [be] no 'trade off' of any monetary recovery for such corporate governance changes" and adds that corporate governance changes were not negotiated "until we had reached agreement in principal on the monetary settlement with Cendant." Supp. Decl. ¶ 5. Lead Plaintiffs remark that the corporate governance changes are directly related to claims in this case, benefit all Cendant shareholders and make the directors and officers more accountable to prevent similar problems. *See* Coffee Decl. ¶¶ 82–86. Lead Counsel volunteer that foregoing additional cash recovery for corporate governance changes is inimical to their own interests: Lead Counsel will not receive 8.275% of the hypothetical value of these changes as fee. Coffee Decl. ¶ 79.

The Court finds that Throenle's objection regarding the corporate governance changes has no substance. There has not been the slightest indication that the cash portion of the settlement was related to, dependent upon, or intertwined with the governance proposals.

■ Lead Plaintiffs categorize the next set of objections, common to all objectors:

Each of the objectors complains that, in prosecuting and settling the Action, Lead Plaintiffs somehow ignored or disfavored him or her, or his or her subgroup. Unsurprisingly, now that the case has concluded, each is sure that he or she would have done a better job, and should now be appointed to "protect" the interests implicated by their claims.

Reply Brf. at 17. Lead Plaintiffs rely on this Court's earlier opinion that "Rule 23(a) does not require that every class member share every factual and legal predicate." *In re Cendant Corp. Litig.*, 182 F.R.D. 144, 148 (D.N.J.1998). The Court added that the existence of plaintiffs with different holdings "does not justify

the appointment of potentially innumerable co-lead plaintiffs" because this "could well hamper the force and focus of the litigation." *Id.*

Lead Plaintiffs add that unlike cases where classes are certified for settlement only, the composition of the class here was already scrutinized and certified for litigation. This distinguishes the current settlement from cases relied upon by objectors where settlements were rejected because of intraclass conflicts. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). In these two cases, settlements were rejected because the settlement class contained plaintiffs with competing interests. In *Amchem*, the Court concluded that as-yet uninjured members "share[d] little in common with the presently injured class members." 521 U.S. at 624, 117 S.Ct. 2231.

The *Amchem* and *Ortiz* settlements were distinguished by the Eighth Circuit in *Petrovic v. Amoco Oil Corp.*, 200 F.3d 1140, 1148 (8th Cir.1999), precisely because they were settlement, not litigation, classes. *See also* Issacharoff Decl. ¶¶ 9–15. Additionally, *Petrovic* stated that unless the court reviewing settlement finds the "stark conflicts of interest that the Supreme Court discerned in *Amchem* and *Ortiz*," a settlement which contains class members who may recover different amounts is acceptable. 200 F.3d at 1148 ("It seems to us that almost every settlement will involve different awards for various class members."). Lead Plaintiffs further rely on *In re Prudential Insurance Co. of America Sales Practices Litigation*, where the Court found that "the named plaintiffs, as well as the members of the proposed class, all have claims arising from the fraudulent scheme perpetrated by Prudential. That overarching scheme is the linchpin [of the complaint], regardless whether each class member alleges a churning claim, a vanishing premium claim, an investment plan claim, or some

other injury." 148 F.3d 283, 311 (3d Cir. 1998), *cert. denied,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999). Moreover, Lead Plaintiffs cite numerous securities cases where classes were approved which alleged injury under more than one securities law provision.[9] Reply Brf. at 22–23. They conclude that even *Amchem* recognized that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud." *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231.

What these objectors who seek subclasses fail to acknowledge is that this action has been proceeding as a class action for the past 20 months. Lead Counsel moved to certify the class in December 1998 and not one of these class members objected (E & Y filed an objection to class certification, later withdrawn). The Court agrees with Lead Plaintiffs that *Amchem* and *Ortiz* are readily distinguished because those actions addressed *settlement* classes—the *Amchem* and *Ortiz* courts were presented with the class definition and the settlement simultaneously. *Amchem,* 521 U.S. at 620, 117 S.Ct. 2231; *Ortiz,* 119 S.Ct. at 2305. In contrast, this Court has had "the opportunity, present when a case is litigated, to adjust the class [if necessary], informed by the proceedings as they unfold." *Amchem,* 521 U.S. at 620, 117 S.Ct. 2231. Here, before announcement of the settlement, class adjustment was never requested, no decertification requests were made, and no plaintiff sought to be added as co-Lead Plaintiff. Importantly, the members of the *Amchem* and *Ortiz* classes had clear, irreconcilable interests. *See Petrovic,* 200 F.3d at 1146 ("[T]he injuries involved in those cases were extraordinarily various, both in terms of the harm sustained and the duration endured"). In contrast, CalPERS class members "share common objectives and legal or factual

positions." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 1769 (2d Ed.1986), *quoted in Petrovic,* 200 F.3d at 1148. They all seek the same thing—compensation under the federal securities laws for fraud perpetrated by Cendant and other defendants. *Petrovic,* 200 F.3d at 1148; *see also In re Prudential,* 148 F.3d at 311 (stating that all claims have the same "linchpin"—"claims arising from the fraudulent scheme perpetrated by Prudential").

With regard to objections about the sufficiency of the Notice of Settlement brought by Throenle and Duncan, plaintiffs state that notice is sufficient where it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *See United States v. One Toshiba Color Television,* 213 F.3d 147, 2000 WL 669978, at *1 (3d Cir. May 24, 2000). Moreover, a notice of settlement "need only satisfy the broad 'reasonableness' standards imposed by due process." *Petrovic,* 200 F.3d at 1153. Lead Plaintiffs claim this standard was met and further that the notice complied with the PSLRA's mandate that it specify whether the parties dispute the maximum amount of damages recoverable. *See* 15 U.S.C. § 78u–4(a)(7)(B)(ii).

These objections are discussed in the Court's *Girsh* analysis, below.

Finally, Lead Plaintiffs respond to objections concerning the Plan of Allocation. They state that the Plan of Allocation need not be perfect so long as it is "fair, reasonable and adequate." *See* Fed.R.Civ.P. 23. Here, according to them, the methodology—"event study methodology"—used to calculate shareholder damages during the class period "has been used by financial

---

**9.** They single out Mark and state that her objection that Lead Plaintiffs could not represent both class members with Section 11 claims and Section 10(b) claims is meritless as Mark herself possesses claims under both sections. Moreover, Mark's attorneys have

been involved in this matter since April 1998 and have never objected to the Amended Complaint, even after receiving a draft prefiling, and never requested certification of subclasses.

economists since 1969 as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation." Reply Brf. at 32; Dorkey Aff. ¶ 18. It is so accepted, plaintiffs add, that courts now reject expert damage estimates which do not use event study methodology to evaluate the impact on the market of a company's disclosures:

> Use of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to Oracle which defendants allegedly have distorted. As a result of his failure to employ such a study, the results reached by [the expert] cannot be evaluated by standard measures of statistical significance.

*In re Oracle Securities Litig.*, 829 F.Supp. 1176, 1181 (N.D.Cal.1993). The event study methodology used by Lead Plaintiffs increases over time the amount of share price allocable to misleading statements to take into account cumulative effects of multiple overstatements. Dorkey Aff. ¶ 34. Lead Plaintiffs point to a similar plan of allocation praised by Judge Walker in *In re California Micro Devices Securities Litigation*, 965 F.Supp. 1327, 1332 (N.D.Cal.1997) as "by far the most thorough, sophisticated and well substantiated" plan he has seen in a securities class action. During the fairness hearing the Court permitted the Davidsons to submit additional briefing related to their challenge to the plan. The plan is evaluated in Section G, below.

Lead Plaintiffs also address the Davidsons' argument that the escalating damages calculation in the plan ignores "in-and-out" damages. They counter that the plan does not "ignore" such damages but rather expressly rejects such damages, Miller Decl. ¶¶ 29–30, because it illustrates that those who purchased then sold Cendant stock while it was still inflated (pre-April 15, 1998) benefitted from the company's ongoing fraud and suffered no damage. "[A] plaintiff who sells a portion of stock at a profit 'should not be allowed to retain this profit in silence while pleading to be made whole for his losses.'" Miller Decl. ¶ 29 (quoting *Richardson v. MacArthur*, 451 F.2d 35, 44 (10th Cir.1971); citing *Abrahamson v. Fleschner*, 568 F.2d 862, 878 (2d Cir.1977)).

### F. The Court's Analysis of the Proposed Settlements

#### 1. Class Notice

■ Certain class members object to the sufficiency of the notice of settlement. "In order to satisfy due process, notice to class members must be 'reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Lachance v. Harrington*, 965 F.Supp. 630, 636 (E.D.Pa.1997) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

*Ikon*, 194 F.R.D. at 174. To satisfy this standard, the notice must inform class members of (1) the nature of the litigation; (2) the settlement's general terms; (3) where complete information can be located; and (4) the time and place of the fairness hearing and that objectors may be heard. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 527 (D.N.J.1997), *aff'd*, 148 F.3d 283, 311 (3d Cir.1998), *cert. denied,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999).

And the PSLRA imposes certain other requirements, the notice must disclose: (5) the amount of the settlement and proposed distribution to plaintiffs; (6) if the parties to settlement disagree on the average amount of damages per share (as is the case here), "a statement from each settling party concerning the issue or issues on which the parties disagree"; (7) a statement of attorneys' fees or costs sought; (8) the name, address and telephone number of plaintiffs' representatives; and (9) "[a] brief statement explaining why the parties

are proposing the settlement." *See* 15 U.S.C. § 78u–4(a)(7).

The notice sent to Cendant class members complied with these requirements. Duncan's objection that the notice of settlement is defective because it failed to advise her and others of the tax consequences is rejected as is her unsupported allegation that the notice is not understandable. *See, e.g., Prudential,* 962 F.Supp. at 530 ("this Court is unaware[ ] of any authority requiring the level of individualized information that [plaintiff] demands"). Throenle's objection to the settlement notice as failing to inform shareholders of all disputed issues is also rejected. Lead Plaintiffs were not required to list all issues on which the parties disagree, only disputed damages issues. The PSLRA provision at issue is captioned "Disagreement on Amount of *Damages*"—the Cendant notice reads: "Cendant, the HFS Individual Defendants, and E & Y deny all liability and dispute the maximum amount of damages recoverable." Notice at 1. It continues, "Defendants strongly disputed the [damages] analysis . . ., particularly the amount of recoverable damages" and adds "Cendant supplied Lead Counsel with the analyses prepared by Cendant's own financial consultants and damages experts." Notice ¶ 12. *See also* § 78u–4(a)(7)(B)(ii). The Court finds these passages sufficient to put members of the class on notice that the damages estimate of Lead Plaintiffs was and is contested by all settling defendants.

Further, while Throenle's assertion that she was not provided with crucial information by the Clerk of the Court is disturbing, the requested information was given to her by Lead Counsel on or around May 23, 2000. Moreover, the notice provided to all class members Lead Counsel's addresses and phone numbers in the event they had any questions about any matter contained in the notice. Notice at 2. The Court finds that shareholders' access to Lead Counsel, combined with counsel's re-sponsiveness to Throenle's request for documents, demonstrates that objectors had access to all relevant court-filed documents.

All other objections to the notice of settlement are rejected as requiring unreasonable or unnecessary information.

The Court concludes that the Notice of Settlement complied with Rule 23(e) and due process.

### 2. General Principles of Substantive Analysis

Federal Rule of Civil Procedure 23(e) governs this analysis: the settlement must be fair, reasonable and adequate. The nine-factor *Girsh* test is the guide. *See Girsh,* 521 F.2d at 157. This test directs this Court to conduct (1) "a substantive inquiry into the terms of the settlement relative to the likely rewards of litigation" and (2) "a procedural inquiry into the negotiation process." *General Motors,* 55 F.3d at 796. The Court, however, cannot substitute its concept of an "ideal" settlement for the one presented by the parties: "Significant weight should be attributed 'to the belief of experienced counsel that settlement is in the best interest of the class.'" *Lake v. First Nationwide Bank,* 900 F.Supp. 726, 732 (E.D.Pa. 1995). "Thus, the issue is whether the settlement is adequate and reasonable, not whether one could conceive of a better settlement." *In re Prudential,* 962 F.Supp. at 534 (citing *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297 (N.D.Ga.1993)).

"[C]ourts approving settlements should determine a range of reasonable settlements in light of the best possible recovery (the nine *Girsh* factors) and a range in light of all the attendant risks of litigation." *See General Motors,* 55 F.3d at 806. Put differently:

> In formulaic terms we agree that "in cases primarily seeking monetary relief, the present value of the damages plaintiffs would likely recover if successful,

appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." This figure should generate a range of reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside. The evaluating court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.

*Id.* (citations omitted).

As noted, the Cendant settlement provides for a payment of $2,851,500,000 cash to the class and additional payment to the class from Cendant and the HFS Individual Defendants in the event they recover damages in their suits against E & Y— 50% of any net recovery. The E & Y settlement pays $335,000,000 cash to the class. Before proceeding to the *Girsh* factors, *General Motors* directs the Court to determine the value of the settlement to the class. 55 F.3d at 806–07. The element of uncertainty in the valuation of the Cendant settlement is the contingent payments to the class by Cendant and the HFS Individual Defendants from any recovery against E & Y. The Court previously refused to rule the HFS contribution "illusory" or "de minimis" but placed no concrete value on it. In their action against E & Y, the HFS Defendants claim losses of over $1 billion. HFS Brf. at 23. Lead Plaintiffs state that these two potential contributions "may prove significant given the extent of damages Cendant and the Individual HFS Defendants are seeking to recover against E & Y." Brf. at 4. The Court recognizes that this recovery is inchoate but once again affirms that it is not "illusory." This does not mean that valuation is impossible, but only difficult. However, as shown below, even before any added value from recovery against E & Y

is factored into the evaluation of the settlement, the now calculable settlement of $3.1 billion is "fair, reasonable and adequate."

a. First *Girsh* Factor: Complexity & Likely Duration of Litigation

This factor captures "the probable costs, in both time and money, of continued litigation." *General Motors,* 55 F.3d at 812 (quoting *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 801 (3d Cir. 1974)). Lead Plaintiffs assert (1) the claims presented complex legal and technical accounting issues which would require extensive preparation and in-depth expert testimony; (2) this case is settling long before trial—"[w]ith discovery in its early stages, if Lead Plaintiffs were to press toward a trial, it would be at least one to two years before a trial could begin," Joint Decl. ¶ 131(i); and (3) even if the class recovered at trial, post-trial motions and appeals would likely delay recovery. E & Y adds that an action against the firm would also involve a substantial investment of time by Lead Plaintiffs.

The Court agrees. To get to the eve of trial against either E & Y or Cendant, the parties would have to engage in a lengthy discovery process. Moreover, discovery would be complicated by the number of defendants, both individual and corporate, which would likely require significant devotion of time and energy by Lead Counsel. Further, the information revealed through discovery would present complex accounting issues necessitating expert review and testimony. In addition, continued prosecution of the class action would lead to further factual disputes. Cendant and E & Y are, in essence, blaming one another for the CUC accounting errors. Lead Counsel would be required to attempt to trace the alleged accounting errors to their source and allocate blame at trial. Lead Counsel would also have to prosecute its claims against all 28 individual defendants and prove their level of involvement in the wrongdoing.

Complex legal issues would also arise: The PSLRA changed the playing field for securities class actions. The Court has already had to address novel legal issues under the statute, such as appointment of Lead Counsel and Plaintiffs. The Court anticipates that continued prosecution of the action would give rise to additional issues not yet addressed by other courts. From this litigation, the Circuit has recently expanded the definition of "in connection with" as used in Section 10(b). *See Semerenko v. Cendant Corp.,* 223 F.3d 165 (3d Cir.2000).

Moreover, even if no novel legal issues were presented:

> [T]he litigation would be legally and factually complex and extremely expensive and time-consuming. Class Counsel would require months to consult with additional experts, to prepare trial memoranda, to prepare post-trial memoranda, and to take interlocutory and other appeals. Moreover, if tried, the trial would last for months and would not be completed for years. *See, e.g., Weiss v. Mercedes–Benz of North America, Inc.,* 899 F.Supp. 1297, 1301 (D.N.J.1995) ( "Given the crowded state of this Court's calendars, the case would not be tried prior to 1997 [opinion dated May 11, 1995]. It is not unrealistic to predict that, if fully litigated, the present class action would not be concluded before the end of this decade. . . ."); *In re Warner Communications Securities Litigation,* 618 F.Supp. 735, 745 (S.D.N.Y.1985) ("Although much discovery has been conducted, much would remain if the parties were to go to trial.").

*In re Prudential,* 962 F.Supp. at 536, *aff'd,* 148 F.3d at 317 ("the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both parties and the court."); *see also In re Ikon,* 194 F.R.D. at 178 (the "inherently complicated nature of large class actions alleging securities fraud" weighed in favor of settlement). It

may well be that a realistic trial date cannot be before 2002.

The post-fairness hearing submission by Duncan does not alter this conclusion. The complexity of plaintiffs' case against E & Y is at least as complex, if not more so, than the case against Cendant.

This factor counsels in favor of settlement approval.

b. Second *Girsh* Factor: The Reaction of the Class

Courts must examine the class reaction to the proposed settlement. Here four class members object to the settlements (one specifically addresses the Plan of Allocation) and two non-class members object. None of the objectors is an institutional investor, though the Davidson objectors had and have significant holdings.

A small percentage of objectors may lead to the inference that the majority of the class "silent[ly] consent[s]" to settlement. *See Weiss,* 899 F.Supp. at 1301, *aff'd,* 66 F.3d 314 (3d Cir.1995). According to Lead Plaintiffs, 478,000 notices of settlement have been sent and 30,000 claims were filed pre-fairness hearing (50,000 through July 24th). Moreover, only 234 class members opted out by December 27, 1999.

The Court finds the number of objectors minimal in light of the number of notices sent. *See generally Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 118–19 (3d Cir.1990) (29 objections in a 281 member class indicates class favors settlement); *In re Prudential,* 148 F.3d at 318 (affirming conclusion that class reaction was favorable where 19,000 policyholders out of 8 million opted out and 300 objected). Moreover, the Court takes as an extremely favorable indicator of class reaction that the proposed settlement was announced *before* the opt-out deadline, yet only 234 potential class members declined to join this action. An additional favorable factor is the absence of institutional investor-ob-

jectors which are presumably experienced in responding to settlement notices. Significantly, one large investor, Daystar Partners, an investment limited partnership with over $35 million in losses, has dismissed its individual action and rejoins the class for settlement.

While too much should not be read into low response rates in general, *see General Motors,* 55 F.3d at 813, the lack of objection by those most experienced in securities class actions indicates a favorable class reaction.

This factor counsels in favor of settlement approval.

#### c. The Third *Girsh* Factor: The Stage of Proceedings

This factor "captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *General Motors,* 55 F.3d at 813; *see also In re Warner Communications Securities Litig.,* 618 F.Supp. 735, 745 (S.D.N.Y. 1985), *aff'd,* 798 F.2d 35 (2d Cir.1986). Here the case commenced in April 1998, the Amended Class Action Complaint filed in December 1998 and a proposed settlement announced in December 1999. And this Court has maintained direct supervision throughout. No other judicial officer has been involved.

In the current case, Lead Counsel submit a detailed explanation of "informal" discovery conducted while the defendants' motions to dismiss were pending (between commencement of the action and July 1999), including: (1) analysis of all public filings, articles and analyst reports concerning CUC, HFS and Cendant, including the analysis of all of CUC's and Cendant's financial statements, restatements, and the Wilkie Farr & Gallagher ("WF & G") and Arthur Andersen ("AA") Reports to the Cendant Audit Committee; (2) investigation, with the assistance of a private investigation firm, of Cendant, each HFS and

CUC Individual Defendant, E & Y and the senior E & Y auditors responsible for CUC and CMS audits; (3) interviews of many former CUC, Cendant and E & Y employees; (4) review of documents produced by Cendant, including all documents provided to WF & G and AA in connection with their investigations into Cendant; (5) retention of the accounting firm Marks Peneth & Schron LLP to assist in the above analysis of Cendant's documents.

Once the motions were denied and formal discovery commenced (post-July 1999), Lead Counsel: (6) served document requests and interrogatories on all defendants and served subpoenas on relevant non-parties; (7) reviewed documents produced in response, including all of Cendant's responsive documents, three years of annual and quarterly audit reports provided by E & Y, papers produced by WF & G, and papers produced by Bear Stearns & Co., advisor to HFS in the HFS/CUC merger. Moreover, in preparation for settlement negotiations, Lead Counsel: (8) retained investment banker Lazard Frères & Co., financial consultant Arthur S. Ainsberg, and damages expert Forensic Economics, Inc. Lazard Frères then: (a) obtained confidential business information from Cendant (the type of information obtained in due diligence in connection with a merger or acquisition); (b) met with senior Cendant financial personnel, including the Chief Financial Officer, and representatives of Merrill Lynch; (c) prepared a detailed five-year model of Cendant's financial condition; (d) developed extensive projections assuming a possible range of settlement amounts; and (e) in May–June 1999, briefed Lead Plaintiffs and Counsel and provided results of its study to Cendant. Lead Counsel further: (9) worked with Forensic Economists to prepare a damages analysis; and (10) reviewed a report prepared by Cendant's damages expert, NERA.

Lead Counsel, in addition to conducting informal and formal discovery, also litigat-

ed pretrial motions, including: a motion for clarification of a May 1998 consolidation order, *see In re Cendant Corp. Litig.*, 182 F.R.D. 476 (D.N.J.1998); the motion for class certification (granted in January 1998); and the motions to dismiss filed by all defendants decided in July 1999, *see In re Cendant Corp. Litig.*, 60 F.Supp.2d 354 (D.N.J.1999). Records indicate that they also filed, but stayed, a motion for partial summary judgment of liability against Cendant. *See* 98–1664, Docket No. 150 (Dec. 14, 1998).

 Duncan specifically attacks the timing of settlement: "The three felons at Cendant have only begun to cooperate freely with the United States Attorneys' Office." She poses the rhetorical question: "[W]ho will really be surprised when that cooperation leads to direct evidence, or even admissions, of fraud against the E & Y personnel with whom these three felons worked?" She also states that settlement is premature because not one deposition was taken by class counsel, nor did they review 25 boxes of documents produced by Cendant.

The Court is not persuaded by Duncan's objections. As described, Lead Counsel conducted significant investigation, including review of all documents produced in response to the WF & G/AA investigation. Moreover, Lead Counsel make clear that they have looked at every document, including those which Duncan alleges were not reviewed. Finally, the Court does not adopt Duncan's "wait and see" approach to the E & Y settlement. If that were to happen, significant delay would occur to any recovery by the class against E & Y. Civil depositions of any target of a criminal investigation are stayed and the United States Attorneys' Office has already indicated its disapproval of any ongoing civil action; Lead Counsel have had access to the substance of the recent pleas; SEC enforcement and United States Attorneys' documents do not necessarily support Duncan's contention that given additional time, clear evidence of E & Y's wrongdo-

ing will emerge. And even if so, substantial enhancement of E & Y's proposed payment to the class remains problematic for reasons later discussed.

The record reveals, and the Court finds, that the parties understood the merits of the class action and "could fairly, safely and appropriately" decide to settle the action with Cendant and E & Y. *In re Prudential*, 962 F.Supp. at 538. Counsel conducted extensive discovery, retained and used experts, and litigated pre-trial motions.

This factor counsels in favor of settlement.

d. The Fourth *Girsh* Factor: The Risks of Establishing Liability

The Court considers this factor in order to "examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *General Motors*, 55 F.3d at 814. Necessarily, the risks of establishing liability vary with the particular defendant. To repeat, the Amended Complaint plead that all defendants violated § 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k, that Cendant violated § 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), that defendants Walter Forbes, Shelton, McLeod, and Corigliano violated § 15 of the Securities Act, 15 U.S.C. § 77*o*, that defendants Cendant, Walter Forbes, Shelton, McLeod, Corigliano, Pember, Silverman, Snodgrass, Monaco, Buckman, Scott Forbes, and E & Y violated § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, that defendants Walter Forbes, Shelton, McLeod, Corrigliano, Pember, Silverman, Snodgrass, Monaco, Buckman, and Scott Forbes violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), that defendants Walter Forbes, Shelton, McLeod, Corrigliano, Silverman, Snodgrass, and Buckman violated § 20A of the Exchange Act, 15 U.S.C. § 78t–1, and that Cendant, the

HFS Individual Defendants except Scott Forbes and the CUC Individual Defendants except Pember violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a–9, 17 C.F.R. § 240.14a–9.

*Cendant*

With regard to Cendant Corporation, in October 1998, the Court wrote: "Basic liability in this case has been conceded by the major corporate defendant. No one needs to be reminded that it was Cendant's public admission on April 15, 1998 that spawned this litigation." *In re Cendant Corp. Litig.*, 191 F.R.D. 387 (D.N.J.1998). This conclusion stands with regard to Cendant's liability to former HFS shareholders for false and misleading statements in the December 1997 Registration Statement. *See* 15 U.S.C. § 77k. While Cendant may dispute this, Lead Plaintiffs, in the brief in support of settlement, maintain "the claims against the company were strong." Brf. at 17. The difficulties of establishing liability against Cendant are relatively easier on the issue of basic liability but increase when its degree of liability is considered—"even if the Class's claims against Cendant were successful, the jury might have found that Cendant bore only a small proportion of the responsibility for the damages suffered by the Class." Brf. at 17 (citing the PSLRA's provision on proportionate liability which prohibits the collection of damages from a defendant in excess of damages actually caused, *see* 15 U.S.C. § 78u–4(f)(3)(A)).

The Court agrees with this assessment. The risk of establishing basic liability against Cendant is not high, the risk increases, however, when the PSLRA's proportionate liability standard is factored into the equation.

In its October 1998 Opinion, the Court also "recognize[d] the need [of the Court and the plaintiff class] to explore the nature and extent of any involvement of the other defendants, individual and corporate, and the representations made by Cendant's corporate predecessor(s) in 1997

and earlier years." *Id.* This conclusion also remains:

*E & Y*

E & Y claims that "plaintiffs' ability to prove E & Y's liability for Cendant's fraud is doubtful." E & Y Brf. at 3–4. Lead Plaintiffs also assert that their risk of establishing liability against E & Y is high because: (1) E & Y continues to deny all knowledge of and participation in CUC and Cendant's fraudulent scheme; (2) the AA and WF & G investigation "disclosed many instances in which CUC or Cendant Membership Services employees went to great lengths to conceal from E & Y pertinent information;" and (3) "no one has contended that E & Y knowingly perpetrated the fraud." LP Brf. at 17–18.

To succeed on the Section 10(b) claims against E & Y, the class would have to show at the very least that the auditor was "so reckless that an inference of intent might be drawn." *In re Leslie Fay Cos.*, 871 F.Supp. 686, 692 (S.D.N.Y.1995). Less or no scienter is needed under Section 11. *See In re Cendant*, 60 F.Supp.2d at 364. E & Y also possesses a "due diligence" defense under this statute; E & Y may escape liability if it had, "after reasonable investigation, reasonable ground to believe and did believe" its statements were not misleading. 15 U.S.C. § 77k(b)(3).

The level of scienter required by Section 10(b) and E & Y's potential defenses under Section 11 lead the Court to agree that Lead Plaintiffs face significant obstacles to establish E & Y's liability. Moreover, other courts which have addressed securities class actions against accounting firms also have found the risk of establishing liability high. *See In re Oracle*, 829 F.Supp. at 1183 ("There is no proof, however, that Arthur Andersen [Oracle's auditor] deliberately or recklessly violated any duty it owed to the plaintiffs. In the absence of such proof, it is unlikely that plaintiffs could sustain their claims against Arthur Andersen."); *see also In re Computron Software, Inc.*, 6 F.Supp.2d 313, 317 (D.N.J.1998) ("In light of the possibility

that Arthur Andersen was intentionally misled by Computron during its audits, the Plaintiff Class might not have been able to establish liability"). Here there would also be the threat, remote or great, that successful litigation by the class would cause E & Y to escape the financial consequences through the bankruptcy window.

*Individual Defendants*

Of the 28 individual defendants, 18 are outside directors named only as defendants under Sections 11 (Registration Statement) and 14 (Proxy). Each of these outside directors has a due diligence defense which could allow him or her to avoid liability through reliance on the work of experts—E & Y. In addition, the five inside directors of HFS, Silverman, Snodgrass, Monaco, Buckman, and Scott Forbes, also possess the same due diligence defenses with respect to E & Y's certifications of the CUC and CMS financial statements. Moreover, these HFS directors arguably cannot be held liable for any false and misleading CUC statements issued pre-merger—75% of the class period. Of the remaining individual director-defendants (CUC's inside directors) only two have been identified as having played any active role in CUC and CMS's fraud, Corigliano and Pember. The WF & G/AA investigation made no finding of partic-

ipation by Walter Forbes, Shelton, or McLeod.

These defenses accorded to 23 of 28 directors, combined with the difficulties that Lead Plaintiffs face to prove that defendants Forbes (Scott and Walter), Shelton, McLeod, Silverman, Snodgrass, Monaco, and Buckman acted with the requisite level of scienter under Section 10(b), cause the Court to conclude that Lead Plaintiffs faced risk in establishing liability against this group of defendants. Moreover, as with all other defendants, the Court must also consider that the PSLRA requires allocation of proportionate liability. This further complicates Lead Plaintiffs' case against the individual defendants.

In conclusion, this factor varies depending on the defendant but overall weighs in favor of settlement.

e. The Fifth *Girsh* Factor: The Risks of Establishing Damages

Like the fourth factor, "this inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time." *General Motors*, 55 F.3d at 816. As presented by Lead Plaintiffs, total damage to class members ranges between $8.5 and $8.8 billion.[10] *See*

10. Damages were calculated by the expert under Sections 10(b) and 11. The Plan of Allocation awards to each individual plaintiff whichever damages are greater.

Section 10(b) damages are "out of pocket" damages. Dorkey Aff. ¶ 42. The PSLRA seeks to limit Section 10(b) recovery solely to what can be considered "out of pocket" loss by setting a statutory framework for the analysis. 15 U.S.C. § 78u–4(e)(1)–(2). To wit:
(1) Except as provided in paragraph (2), in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90–day period beginning on the date on which the information correcting the misstatement or

omission that is the basis for the action is disseminated to the market.
[or]
(2) In any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, if the plaintiff sells or repurchases the subject security prior to the expiration of the 90–day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security.
Section 11(e) damages are:
such damages as *shall represent the difference between the amount paid for the security (not exceeding the price at which the secu-*

Dorkey Affs. Cendant's damages expert and E & Y dispute this amount.

Lead Plaintiffs say that proof of damages against all defendants would lead to a "battle of experts." *See In re Greenwich Pharm. Securities Litig.*, No. 92–3071, 1995 WL 251293, at *4 (E.D.Pa. April 26, 1995) ("Because fair value presumably will differ from the stock market price (the latter being inflated by the fraud), expert testimony is almost always necessary to establish the amount—and indeed the existence—of actual damages"); *see also Warner*, 618 F.Supp. at 745 ("[i]n this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited"). Lead Plaintiffs repeat that proof of damages is further complicated by the proportionate liability restrictions of the PSLRA. E & Y insists that plaintiffs face increased risk in establishing damages against the accounting firm because it is prepared to prove at trial that "the decline in Cendant's stock price following the announcement of the accounting irregularities was largely due to factors on which E & Y had never offered any opinion and conduct in which E & Y was not involved." E & Y Brf. at 13.

The supplemental analysis provided by Lead Counsel in answer to Duncan's additional briefing further illustrates the difficulty of calculating damages caused by E & Y. Initially, the firm is not liable to post-April 15, 1998 purchasers. And to hold E & Y jointly and severally liable, Lead Counsel must be able to prove that the firm committed knowing violations of the securities laws, otherwise E & Y would only be liable for the proportion of damages caused by its conduct. There are numerous individuals and entities who may have caused some part of the shareholder damages. There is also the very real risk that E & Y's vigorous attempt to place all blame on Cendant would succeed at trial.

In sum, this factor weighs in favor of settlement.

f. The Sixth *Girsh* Factor: The Risks of Maintaining the Class Action Through Trial

Under Federal Rule of Civil Procedure 23(a), a district court "may decertify or modify a class at any time during the litigation if it proves to be unmanageable." *In re Prudential*, 148 F.3d at 320. To date, this class has not been unmanageable, but proceeding to trial would always entail the risk, even if slight, of decertification. *See id.* ("Because the district court always possesses the authority to decertify ... examination of this factor in the standard class action appear to be perfunctory. There will always be a 'risk' ..., and consequently the court can always claim this factor weighs in favor of settlement.").

Accordingly, this factor weighs (slightly) in favor of settlement.

g. The Seventh Factor: The Ability of the Defendants to Withstand Greater Judgment

Aside from the cautionary Texaco tale, no supporting financial information has been provided by Lead Plaintiffs, Cendant

---

*rity was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought: Provided, That if the defendant proves that*

any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.
15 U.S.C. § 77k (emphasis added); *see also* Dorkey Aff. ¶ 43.

or E & Y as to the parties' abilities to withstand greater judgment.

■ However, plaintiffs' failure to evidence that higher judgment could not be sustained will not scuttle a settlement where other factors counsel settlement approval. *See In re Ikon,* 194 F.R.D. at 190 ("The court has no information on this subject [ability to withstand greater judgment].... Consequently, this factor does not weigh in favor of settlement"); *see also Weiss v. Mercedes–Benz,* 899 F.Supp. 1297, 1302 (D.N.J.1995) (finding that Mercedes could withstand higher judgment but approving settlement); *see generally In re Medical X–Ray Film Antitrust Litig.,* No. 93–5904, 1998 WL 661515, at *5 (E.D.N.Y. Aug. 7, 1998) (approving settlement despite lack of evidence on defendant's ability to withstand higher judgment).

Moreover, at least as far as Cendant is concerned, objective benchmarks support Lead Counsel and Cendant's stance that sustaining a larger judgment, and possibly even a larger settlement, might prove fatal. Particularly, the significant percentage of Cendant's market capitalization that will be paid to the class—approximately 25–30%. Even more striking is that Lead Plaintiffs' total damages calculation represents approximately 80–95% of market capitalization (depending on market close)—a figure difficult for this Court to imagine Cendant paying without seeking shelter in our bankruptcy laws.

As for E & Y, the Court cannot make any confident determination of the defendant's ability to pay a higher judgment. The Court does note: the settlement is equivalent to payment of $127,000 by every E & Y partner, including the many who had no involvement with Cendant, to the class; Duncan, the only E & Y objector, does not allege that E & Y is capable of paying $6.2 billion—the largest possible amount of damages sustained by pre-April 15, 1998 purchasers; the settlement amount surpasses any audit fees earned by E & Y from CUC; and the amount exceeds E & Y's available insurance coverage.

This factor weighs neither for nor against settlement.

h. The final *Girsh* factors: The Range of Reasonableness in Light of Best Possible Recovery & The Range of Reasonableness in Light of Litigation Risks

"The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Warner,* 618 F.Supp. at 745. The percentage recovery, rather "must represent a material percentage recovery to plaintiff" in light of all the risks considered under *Girsh.*

Here the maximum amount of total damages against all defendants is approximately $8.5 billion. *See* Dorkey Aff. The total settlement amount of nearly $3.2 billion from all defendants represents a 36–37% recovery rate by the plaintiff class. This far exceeds recovery rates of any case cited by the parties. *See Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions* 10–11 (1996) (securities settlements range from 9%–14% of claimed damages). *See also In re Prudential Securities, Inc. L.P. Litig.,* MDL No. 1005, 1995 WL 798907 (S.D.N.Y. 1995) (approving settlement of between 1.6% and 5% of claimed damages); *In re Crazy Eddie Securities Litig.,* 824 F.Supp. 320 (E.D.N.Y.1993) (settlement of between 6% and 10% of damages); *In re Michael Milken & Assocs. Securities Litig.,* 150 F.R.D. 57 (S.D.N.Y.1993) (7.5%).

Taken separately, the E & Y settlement, according to Lead Counsel's calculations, represents approximately 5.4% of the $6.2 billion in damages sustained by pre-April 15, 1998 purchasers; and 9.25% of the damages if it is assumed that E & Y and Cendant bear equal responsibility for the $6.2 billion. Viewed in the context of securities settlements, this figure is in line with

the percentages of recovery described above (between 1.6% and 10% of damages). Viewed in light of recoveries against accounting firms for securities damages, the recovery is large. *Cf. In re Informix Corp. Securities Litig.*, No.1997–1289 (N.D.Cal.); *In re Waste Management, Inc.*, No.1997–7709 (N.D.Ill.) (settlements against accounting firms both for less than 4% of claimed damages). Considering the risks of establishing liability and damages addressed in the evaluation of other *Girsh* factors, the Court concludes that this rate of recovery is fair, reasonable, and not inadequate.

### G. Plan of Allocation

To resay, a Plan of Allocation must also be "fair, reasonable and adequate." *See In re Oracle Securities Litig.*, [1994–1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,355 at 90,446, 1994 WL 502054 (N.D. Cal. June 18, 1994). The strongest objections to the plan are presented by the Davidsons, who attack the methodology used to create the plan.

Lead Plaintiffs' expert, Frank C. Dorkey, President of Forensic Economics, Inc., uses event study methodology to calculate the losses suffered by shareholders and allocate damages. This study attempts to calculate out-of-pocket damages suffered by shareholders due to Cendant's fraudulent accounting practices. Out-of-pocket damages for shares bought during the class period and held until the end of the period are defined as "the price paid for a security minus the 'true value' of the security on the date of purchase—i.e., the value absent the [artificial] inflation caused by claimed misrepresentations or omissions." Dorkey Aff. III ¶ 6 (unless otherwise noted, all further citations to Dorkey's Affidavit refer to his third submission dated July 19, 2000). For shares bought during the class period and sold before its end, the damages "generally equal the artificial inflation at purchase minus the artificial inflation at sale." *Id.*

A summary of the methodology is as follows:

**First, an event study is prepared.** This measures the day-to-day changes of share price and isolates times when the disclosure of information is accompanied by a stock price return outside the stock's normal volatility. Aff. ¶ 12 (a "return" is a day-to-day change in share price illustrated as a percentage). This is done by estimating an appropriate market model to measure returns—here the S & P 500 Index was used. *Id.* ¶¶ 12–14 (detailing selection of appropriate market model). Dorkey then examined the stock's volatility on the following dates in 1998: April 16–20th, to measure the impact of the April 15, 1998 disclosure; July 13–14th, for the preliminary announcement of the results of the WF & G/AA Report on July 14th; and August 27–31, for the release which detailed the report and stated that Cendant's income was artificially increased by $500 million. *Id.* ¶¶ 18–28. Trading volume and price changes on these dates exceeded "normal" volume and returns under the market model. For the first event dates, the statistically significant total excess return is –33.65%; the second, –29.67%; and the last, –9.10%. *Id.* Also considered were other news items disseminated to the market between April 15th and August 31st; other shifts in returns in this time span "were likely to have been caused by the highly volatile market prices of Cendant common stock ... rather than fraud."

**Second, a value line is constructed** which represents the "true value" of Cendant stock (price absent fraud). Two basic steps are involved: (1) estimate the maximum artificial inflation in the market price of CUC or Cendant common stock, expressed as a percentage of closing market price as of April 15, 1998; and (2) apportion that maximum inflation among the twelve reporting periods between May 31, 1995 and April 15, 1998 when inflated earnings were released. Aff. ¶ 31. Dorkey states that he used the method found

in Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases,* 37 U.C.L.A. L.Rev. 883 (1990) (hereinafter "Cornell & Morgan") to set the value line. This method assumes that "the [trading] price and [true] value of the security move in tandem except on days when fraud-related information is disclosed." *Id.* at 886. Here, there are 8 days where the movement of the security cannot be correlated to actual trading results.

Following Cornell & Morgan, Dorkey "constructed returns" to chart the day-to-day changes of Cendant's price; constructed returns equal actual returns except for the eight days targeted by the event study. For these 8 days, returns are predicted under the market model. Cornell & Morgan at 899.

The series of constructed returns are then used to create the value line. The end of the class period is assumed as the point at which, if plotted on a graph, the market price and the true value of the stock converge—there is no more artificial inflation. Aff. ¶ 33(b). On August 31, 1998, Cendant closed at $11.63. Working backward, the artificial inflation rates are then calculated for the period covered by the correcting disclosures. The true value for August 28th is determined by dividing the value on August 31st ($11.63) by [1 + the predicted return on August 31st (under the market model, –6.8%) ]. This yields a true value of $12.47. *See* Cornell & Morgan at 899 (the predicted return under the market model is used for this date because it is one of the 8 days altered by disclosure of fraud). This calculation is repeated for each trading day to determine the true value line through April 15, 1998, the date of the first disclosure of fraud. On that date, the true value of Cendant stock is calculated to be $14.92, *58.1%* of the actual closing price on that date. This date, April 15, 1998, yields the *maximum percentage of artificial inflation.*

**Third, the maximum artificial inflation is allocated over the class period.**

Dorkey relies on the premise that the maximum level of inflation did not remain constant over the class period but gradually increased in the three years over which fraudulent earnings statements were released. Dorkey explains that throughout the class period, the fraudulent releases generally met market earnings expectations, creating a stock price that gradually appreciated with the market model. Aff. ¶ 37. The rate of artificial increase over the class period links the percentage of artificial inflation over the class period (increasing to the maximum percentage of 58.1%) to the actual amount by which each earnings release was overstated over the three year period. This is called the "Ross" approach, developed by David L. Ross of Lexecon, Inc. *Id.* ¶ 38 ("The Ross approach is generally characterized as allocating the maximum artificial inflation in direct proportion to the total cumulative amount of earnings overstatement"); *see also In re California Micro Devices Securities Litig.,* 965 F.Supp. 1327, 1332–33 (N.D.Cal.1997) (approving settlement with Plan of Allocation developed by Ross).

To illustrate, for the quarter ending April 30, 1995, the percentage of the maximum inflation allocated is equal to a fraction of: the amount of earnings per share disclosed as overstated for that quarter, or $.04 per share, over the total overstatement of earnings per share of $.61. For the second quarter of 1995, the fraction is expressed as $.08 (the cumulative amount of overstatement for the first and second quarters) over $.61. Aff. ¶¶ 42–43; Ex. 3 (listing complete allocation of inflation percentages over entire class period). The earnings per share used are those reported by Cendant in its 1997 Form 10–K/A. These earnings were reported on a *pooled* basis, i.e., as if CUC and HFS had always operated as one company. Dorkey used pooled figures in part because "the stock price declines ... occurred in 1998, *after* Cendant was formed." *Id.* ¶ 43. Pooled shares also take into account that a portion of CUC's overvalued assets were, in es-

sence, transferred to HFS shareholders in the merger so that they too were damaged by CUC's fraud. He provides the following hypothetical:

Facts: Ms. X purchases the only 10 shares in CUC for $1 million. CUC's only asset is Building A with a purported value of $1 million. One year later, CUC merges with HFS. At the time of merger, A was still valued at $1 million. Mr. Y was the sole shareholder of HFS and HFS's only asset was Building B valued at $1 million. In the merger, Mr. B is issued 10 shares of CUC stock. Two months later X and Y learn that A is worthless.

Loss: Ms. X's loss on her 10 shares of CUC stock is $500,000, not her original $1 million investment in CUC because she transferred 50% of her worthless asset to Y in the merger. Y's losses are also $500,000. He gave up his $1 million investment in HFS for half of a worthless building and half of a building valued at $1 million.

In contrast, using unpooled shares (i.e., CUC shares pre-merger) to calculate X's loss would lead to the following result:

Loss: X's loss would be the entire amount of her CUC investment, or $1 million because damages are the price she paid for her stock minus that stock's true value ($0, for worthless Building A). The shares issued to Y in the merger are ignored. Y's damages are the price he paid for CUC stock (the $1 million of HFS stock surrendered in merger) less the true value of the investment, or $500,000. Paradoxically, the total amount of damages to X and Y using

unpooled shares would be $1.5 million, or $500,000 more than the total amount of artificial inflation of Building A.

Thus, Dorkey finds that pooled shares yield the most accurate estimate of damages suffered by both sets of shareholders. *Id.* ¶¶ 43–46.

**Fourth, aggregate damages for the class are calculated.** To arrive at the total damages, artificial inflation is "applied" to all shares acquired during the class period that were held until at least April 15, 1998, the date of the first corrective disclosure. Aff. ¶ 47. Dorkey did not allocate *any* damage to those who sold before this date because the shares were still artificially inflated at sale, in fact more so than at purchase under Dorkey's methodology. It is impossible to determine the date on which each and every share was purchased or sold, thus Dorkey used a trading model to simulate actual trading. *See id.* ¶ 48 (citing Dean Furbush & Jeffrey Smith, *Estimating the Number of Damaged Shares in Securities Fraud Litigation: An Introduction to Stock Trading Models,* Bus. Lawyer (Feb.1994)). The model identifies the fraction of each day's volume that represents shares likely purchased and held through April 15th. The model assumes that each share purchased during the class period is more likely to have been traded than the other outstanding shares (the float). *See* Furbush & Smith, *supra,* at 20–22 (indicating that "shares which have not traded recently are less likely to be traded than more recently traded shares"). Using his model, Dorkey estimated that 488.5 million shares were purchased and held beyond the class period and 617.9 million were purchased but sold before the end of the class period. Based on Dorkey's calculation of the total amount of shares traded in the class period, he finds aggregate damage of $8.8 billion.[11]

---

**11.** This calculation factors in the 90–day "bounce back" limitation of the PSLRA, discussed below and at note 10.

*H. Objections to this Plan*

The Davidsons object to Dorkey's plan. They charge that he:

1. Used restated financial statements of Cendant to construct the value line for the entire class period even though Cendant did not exist until December 1997.

2. Incorrectly applied information in the restated Cendant financial statements for the fourth quarter of 1997 which resulted in a bias in favor of former HFS shareholders.

3. Used unestablished financial methodology; his method "was used in only one other securities fraud case." Dav. Supp. Brf. at 10 (citing *In re California Micro Devices Securities Litig.*, 965 F.Supp. 1327 (N.D.Cal.1997)).[12]

The Davidsons present an alternative plan which they assert "is both legally and method-ologically proper" and should be adopted in place of Lead Plaintiffs' plan.

1. Use of Cendant Data

The Davidsons assert that to measure true out-of-pocket damages, CUC data should have been used to determine the artificial inflation amount for each quarter during the class period. "Because the fraud occurred only at CUC before the HFS merger, a proper damage calculation must assess the true value of CUC shares from May 31, 1995 (the beginning of the class period) until December 17, 1997 (the date of the merger between CUC and HFS resulting in the renamed Cendant)." Dav. Supp. Brf. at 13. They allege that if this method was used, the overstatement in earnings per share for first quarter 1996, for example, would be $.13, not the $.06 calculated under Dorkey's plan. Koehn Aff. Ex. 3. They conclude that the

value line calculated under Lead Plaintiffs' plan "yields a hypothetical estimate of the value of a hypothetical Cendant stock .... [and] does not yield any estimate whatsoever of the true value of CUC shares at any time during the class period." Dav. Supp. Brf. at 14.

2. Allocation Backward over Class Period

In a related argument, they assert that even if CUC data were used, Dorkey's plan is still flawed because he "took the market decline following Cendant's corrective disclosures, then allocated that decline back through the class period." Dav. Supp. Brf. at 16. They state that this allocation is flawed first because the expert did not exclude other market factors and information which may have also created material price fluctuations during the class period. *See* Cornell & Morgan at 889–90 (cautioning that release of non-fraud related news must be considered). The objectors also state that Dorkey did not examine for "leakage" of news concerning alleged fraud before Cendant's official releases.

Second, they criticize Dorkey's method of "mechanically" creating a value line linked to Cendant's inflated earnings per share over the three years of the class period. They acknowledge that this method (the Ross approach) was adopted in *Micro Devices*, but distinguish the present situation:

● Micro Devices was not engaged in the "aggressive growth by merger campaign" employed by CUC;

● The fraud in *Micro Devices* spanned only five quarterly reporting periods, not twelve;

● There was no evidence in *Micro Devices*, and none here, that this method

12. This objection also serves as a *Daubert* challenge to use of Dorkey as an expert. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Davidsons present two main challenges to Dorkey's methodology: (1) his use of

pooled shares and (2) his application of the "Ross" approach. For the reasons stated in the Court's analysis of the Plan of Allocation, the Court finds Dorkey's plan to be methodologically sound.

produces a reliable estimate of how a *forward*-looking market (as opposed to the price created by the *backward*-looking event study) would have priced the stock if the fraud had been reported during the period.

### 3. Fourth Quarter 1997 Adjustments

They then maintain that Dorkey's plan is factually erroneous because his calculations for the fourth quarter of 1997 are incorrect. According to Cendant's restated financials, it recognized a reduction in earnings of $283.1 million, described as the "cumulative effect of accounting change." The Davidsons claim that this sum was incorrectly used so. as to create higher damages for later purchasers of Cendant shares and disfavor purchasers from the beginning of the class period. Koehn Decl. ¶ 21.

### 4. Estimate of Total Damages

They also assert that Dorkey's estimate of total damages is off because he based his estimate of trading volume and percentage of retained shares on the daily trading volume of the New York Stock Exchange. "By focusing only on NYSE transactions, he missed millions of shares, especially retention shares." According to them, this weakness is illustrated because CUC shares issued in connection with acquisitions during the class period are not tracked on the NYSE. Moreover, such shares later sold in registered secondary offerings also do not appear on the NYSE. Taking into account non-NYSE acquisitions and sales, according to the Davidsons, pushes the total calculated class damages from approximately $8.8 billion to over $10 billion.

### 5. Conflicts

The Davidsons also take issue with Dorkey's plan because it allegedly creates conflicts of interest. Allegedly, the plan's "constant share" approach is biased in favor of those who acquired shares on the open market whereas a "constant dollar" approach would more fairly estimate the losses of those who acquired CUC shares through merger. As explained by Judge Walker in *Micro Devices*, the constant share approach assumes "that the trader would have purchased the same number of [CUC] shares if the fraud had never occurred," and the constant dollar approach assumes "that the trader would have spent the same amount of money on the company's shares in the absence of fraud." *Micro Devices*, 965 F.Supp. at 1333–34. The Davidsons contend their investment decisions were based not on ˙the number of CUC shares received in merger, but on the dollar value of the shares. They conclude, "a final Plan ·of Allocation must at least consider an adjustment for constant dollar versus constant value approach for retention holders who acquired shares in negotiated corporate transactions, or else it will foster an irreconcilable conflict among Class Members." Dav. Supp. Brf. at 26.

### 6. Section 11

Finally, the Davidsons contend that the plan fails to consider Section 11 damages for those who acquired CUC shares under other registration statements. According to the Davidsons, this makes the plan fundamentally unfair under Rule 23.

As said, the Davidsons urge the Court to accept the Plan of Allocation submitted by Dr. Michael F. Koehn. They state that a court considering settlement may modify a plan of allocation without re-noticing the class. *See Beecher v. Able*, 575 F.2d 1010 (2d Cir.1978). They add that where, as here, the settlement notice reserves to the court the right to modify a plan, those who fail to object to the initial plan have waived their right to object to an alternative plan as well. *See Curtiss–Wright Corp. v. Helfand*, 687 F.2d 171, 173 (7th Cir.1982).

### I. *Response and Analysis*

In answer, Lead Plaintiffs defend Dorkey's plan. They submit expert testi-

mony of Roman Weil, Professor of Accounting at the Graduate School of Business of the University of Chicago and founder of the school's Directors' College, which educates members of corporate boards of directors.[13] Weil declares that the crux of the disagreement between the Davidsons and Lead Plaintiffs is the use of pooled shares in Dorkey's analysis. In fact, he states that, except for Koehn's adjustment for unpooled shares, the alternative plan of allocation is nearly identical to Dorkey's. Ex. RLW–1 (green graph line). He claims that the use of pooled shares is necessary where a company acquires assets it later finds to be tainted by fraud. The pooling of interests recognizes that post-merger, HFS shareholders carry part of the loss suffered by the CUC shareholders. Put another way, once the merger occurred, CUC shareholders' "losses" from overvalued shares were no longer borne solely by CUC shareholders but by HFS shareholders as well. RLW Aff. at 5, lns.160–78.

Lead Plaintiffs refer to the Ms. X/Mr. Y example offered by Dorkey (Aff.¶¶ 43–45) where the damage calculation using unpooled shares "provides a total of $1.5 million in damages, which is $500,000 more than the total amount of artificial inflation of $1 million." They assert that use of unpooled shares to calculate damages ignores the requirement of Section 10(b) that injured parties recoup only damages actually caused by fraud and provides a windfall to original shareholders of the overvalued company. *See Micro Devices*, 965 F.Supp. at 1336 (cautioning against awarding damages "unrelated to any alleged fraud and doing so at the expense of innocent shareholders").

The Court agrees with Lead Plaintiffs that pooled shares are preferred in a situation where a contaminated company acquires assets untainted by fraud during the class period. CUC acquired not only HFS, but other smaller companies between 1995 and 1998, each time "diluting" the damages to earlier shareholders from its fraud by spreading it to newer shareholders. The Ms. X/Mr. Y hypothetical, while simplistic, illustrates this principle and explains how when unpooled shares are used damages actually exceed those traceable to the fraud. Conversely, the Davidsons' plan keeps damages linked to CUC's fraud with the earlier class purchasers (before and during CUC's spate of acquisitions) and does not recognize that their damages were partially alleviated by the acquisition of untainted companies. Dorkey's plan, to the extent that it uses pooled shares to created the "true value" line to determine out-of-pocket damages under Section 10(b), is fair to the entire class. The fairness of using pooled shares over unpooled shares is supported by additional expert testimony. Weil Aff. at 5, lns. 160–82. Because of these reasons, the Court finds the Dorkey pooled shares method to be fair and preferable to the method advanced by the objectors.

1. Confounding or Leaked Information

Lead Plaintiffs assert that the Davidsons' contention that Dorkey did not examine other market information is baseless; Dorkey represents that he examined all news items disclosed to the market between April and December of 1998 for signs of leakage or confounding (non-fraud) information. Aff. ¶¶ 28–29. And he examined the market return rates throughout the entire period to determine periods of statistically significant returns.

The Court finds that this objection has no factual basis and is not justified.

2. Looking Backward

The Davidson's assert that the maximum rate of artificial inflation—58.1%—

---

13. The Court notes that on July 31, 2000, the Davidsons requested exclusion of Weil's affidavit as "inadmissible hearsay" which contains "no independent analysis." The Court finds that Weil is qualified to submit his sworn opinion regarding the Plan of Allocation and sees no reason to exclude his statement.

should not be allocated backward through the class period. Lead Plaintiffs remark that Cornell & Morgan, the text relied upon by both Dorkey and Koehn, the Davidsons' expert, explicitly directs such an allocation. Cornell & Mogan at 899 ("Use the series of returns constructed ... to calculate the value line backwards in time...."). Plaintiffs also remark that despite this objection, the Davidsons' own expert used the same 58.1% inflation rate allocated back over the class period.

Lead Plaintiffs also assert that allocation of inflation "forward" should only be done, if at all, in cases where statistically significant excess returns are caused by misleading disclosures when issued. No significant price or volume swings were caused by the fraudulent earnings reports over the three years they were issued because Cendant was generally meeting the market's earnings expectations for this period. The fraudulent results were no surprise when released; statistically significant returns only occurred once the market was informed that the previous returns were inflated—that is, after April 15, 1998.

The Court finds inexplicable that the Davidsons object to a method used by their own expert to determine artificial inflation rates throughout the class period. *See generally* Koehn Decl. ¶ 25 ("Using information revealed by Mr. Dorkey's event study (i.e., the total stock price decline of 58 percent)...."); RLW–1 (true value lines similar if Koehn's analysis altered for pooled shares). · It is unchallenged that the reverse allocation used by Dorkey forms an integral part of the event study methodology set out in Cornell & Morgan. The Court finds compelling the factual circumstances surrounding the release of overstated financials—here no statistically significant returns are posted up until the initial correcting disclosure; the market had no reason to react to artificial inflation because its expectations were consistently met until April 15, 1998.

### 3. Ross Approach

■ Lead Plaintiffs maintain that criticism of the Ross approach is unfounded. Particularly, they defend the use of cumulative earnings per share overstatement to determine the percentage of inflation attributable to each quarter during the class period. Initially, Lead Plaintiffs state the approach was approved by the *Micro Devices* court:

> Based on the identified inflationary events and corrective disclosures, the plan of allocation pays damages equal to the amount by which per share inflation on the purchase date exceeded that on the sale date. Retention plaintiffs receive an amount equal to the per share inflation on the date of their purchase. This method allocates the settlement proceeds in rough proportion to the damages actually suffered by members of the class.

965 F.Supp. at 1333.

They next argue that the factual differences relied on by the Davidsons to distinguish *Micro Devices* are·insignificant.

The Davidsons contend that CUC then Cendant was a different company from Micro Devices because CUC/Cendant engaged in an aggressive growth-by-merger campaign over the class period. Lead Plaintiffs respond that "[t]o the extent that it matters at all, CUC's aggressive growth campaign was properly considered by Professor Dorkey through his use of pooled shares, which accounts for the dilutive effect of shares issued during the class period." Rep. Brf. at 17. They add that Dorkey also followed the suggestion of Roman Weil's article, *The Role of Accountant as Expert,* cited in Koehn's declaration at 7 n. 2, to perform regression analyses to test the validity of his methodology. Dorkey Aff. III ¶ 14 n. 12 ("Dr. Koehn challenges my use of an event study because Cendant was undergoing significant changes in its business activities. This criticism is resolved by the results of various regression analyses I performed, which estimated

that Cendant's beta was fairly stable before and throughout the class period.").

Lead Plaintiffs then argue that the differences in class period duration—between five quarterly earnings releases in *Micro Devices;* and Cendant, twelve—is irrelevant. No study is offered for the Davidsons' contention that event study methodology should be confined to short class periods. Further, Lead Plaintiffs point out that the Cendant event windows were fewer and shorter in duration than the windows in *Micro Devices*—*Micro Devices* had five windows, Cendant only three (linked to the April, July and August releases).

The Court has examined *Micro Devices,* its summary and use of the Ross approach, and the expert affidavits submitted by both sides: The circumstances of *Micro Devices* are not inapposite; the increase from five quarterly overstatements to twelve does not warrant disapproval of the Ross approach or event study methodology. Here there were actually fewer "events" (correcting disclosures) to create statistically significant returns. The Davidsons' criticism that the rapidly-changing CUC then Cendant was a different company from the static Micro Devices is, as illustrated by the earlier Ms. X/Mr. Y hypothetical, allowed for by the use of pooled shares which factor in CUC's acquisitions over the class period. The Court finds their objection to be without merit and the Ross use of cumulative earnings per share reasonable and appropriate to these circumstances.

### 4. Fourth Quarter 1997 Alleged Errors

Lead Plaintiffs assert, in response to the objection that Dorkey incorrectly calculated earnings per share for the fourth quarter of 1997, that the difference in earnings can be traced to Cendant's restatement of $283.1 million in that quarter caused by what it called an "accounting error." Dorkey included this amount as the fraudulent overstatement because Lead Plaintiffs' Amended Complaint pleads that the ad-

justment was fraud-related. Amended Compl. ¶¶ 58, 73–76.

The Court concludes that this calculation is fair given that the $283.1 million must be accounted for under the Amended Complaint.

### 5. Constant Share/Constant Dollar

■ Lead Plaintiffs argue that the Davidsons' objection that a constant dollar approach should have been used is based entirely on conjecture:

> The "bust out" provision in the DAI–CUC merger agreement *would have* permitted the Davidson Interests to command a much more favorable exchange ration.... They *would have* received many, many more shares in the transaction.... They *would likely have* sold the same percentages of their holdings....

Dav. Supp. Obj. at 25. Aside from these speculations about how they may have acted if the fraud were known in 1996, Lead Plaintiffs contend "[t]he Davidsons offer no rationale for treating class members differently [by using constant dollar for merger acquisitions and constant share for all other purchasers], when both methods may be used for all class members notwithstanding the manner in which they purchased or acquired their shares." They conclude "[t]he Davidsons' approach would create conflict where none exists." Brf. at 19. No other merger-acquired shareholder presents a similar objection.

The best description of the constant dollar/constant share difference is contained in *Micro Devices,* 965 F.Supp. at 1333–1335. There the court favored the constant dollar approach but nevertheless approved a plan based on constant share calculations. *Id.* It concluded "[t]he parties appear to have selected the constant shares method for the sake of simplicity or a matter of routine, not out of a design to advantage certain class members or the defendants at the expense of other class members" and declined to delay payment

of claims based on this objection. *Id.* at 1335.

Such are our circumstances. The Davidsons present no evidence that the plan seeks to devalue merger-acquired shares through use of the constant share method. Compelling is the recognition that while a large number of Cendant shareholders were created through merger of other companies into CUC—e.g., DAI or HFS—the Davidsons are the only ones who allege that such shareholders should be treated differently. To repeat, a Plan of Allocation need not be, and cannot be, perfect. The Court will not invalidate the Plan of Allocation where certain shareholders, seeking advantageous treatment, fail to demonstrate that on the whole the plan is unreasonable. As explained by Lead Plaintiffs, the plan is reasonable.

### 6. Section 11

Lead Plaintiffs attack the Davidsons' argument that those who acquired shares in mergers other than the HFS merger should be entitled to Section 11 damages: "having neglected to opt out of the Class, they are compelled to live with the allegations of the Amended Complaint. The only [Section 11] claims alleged in the Amended Complaint were on behalf of former HFS shareholders." Brf. at 20. Plaintiffs add that even if Section 11 damages were to be assessed to the Davidsons' shares, the Davidsons' Section 10(b) loss amounts are greater.

The Court agrees. Damages may not be allocated for claims not plead. Further, there is no showing that damages from Section 11 claims, if permitted, would be greater than plead Section 10(b) compensation.

### 7. Aggregate Damages

■■■ Lead Plaintiffs next address the Davidsons' objection that the aggregate

number of damaged shares was incorrectly calculated. They recognize that the trading model used to estimate damaged shares is just that—a model: "Because this is a *model*, it will not replicate specific actual trades, like the Davidsons' CUC stock sales; indeed the model may overstate activity on some days during the Class Period, and understate activity on other days." Brf. at 22. They go on to assert that "trading models are accepted as providing reasonably accurate predictions of trading activity over a period of time and are customarily used to estimate trading activity for the purposes of calculating damages in securities fraud cases." *See, e.g.*, Furbush & Smith, *supra*, at 18–22. And even if this objection were sustained, it only affects Lead Plaintiffs' aggregate damage number of $8.8 billion with no impact on the Plan of Allocation, which does not use trading volume. Brf. at 22–23, 23 n. 10.

The Court agrees with Lead Plaintiffs. The use of *trading models is accepted to create an estimate of aggregate damages.* The Davidsons have given no other reason to disregard Dorkey's conclusion other than it is based on a *model.* Their objection is rejected.

### 8. Koehn's Plan

■■■ Finally, Lead Plaintiffs attack Koehn's Plan of Allocation because:

- Dorkey's plan is fair, reasonable and adequate and need not be scrapped;
- Koehn's plan is "deliberately constructed to provide the Davidsons with windfall profits" through the use of unpooled shares;
- Koehn's plan explicitly violates the PSLRA's damage calculation limitation, *see* Koehn Decl. ¶ 6;
- Before two "patches" are added to the calculations,[14] Koehn's plan yields the

---

**14.** According to Lead Plaintiffs, (1) Koehn limits his calculated loss in market value to the market value or less when his calculations reveal a drop larger than market value; (2) he

sets as a further limit that true value cannot be less than .67 of net book value. Thus, whenever his method results in daily true

irrational result that on certain trading days the true value of CUC/Cendant stock is *less than zero.*

The Court recognizes that the PSLRA contains an express limitation on the calculation of damages under Section 10(b). Under the statute, there is what is alternatively referred to as a 90–day "look back" or "bounce back" window. 15 U.S.C. § 78u–4(e)(1) mandates that:

in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security *during the 90–day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.*

(Emphasis added.) Here Koehn states that he did not apply this provision. This admission proves fatal to any attempt to have this Court adopt Koehn's plan which admittedly ignores the PSLRA mandate. In the absence of persuasive reasons, the Court is also reluctant to adopt a plan that reveals a negative "true value" of CUC shares for certain trading days during the class period

*J. Conclusion*

The settlements and Plan of Allocation are approved.

### ORDER

Pursuant to Federal Rule of Civil Procedure 23(e), Lead Plaintiffs, the New York State Common Retirement Fund, the California Public Employees' Retirement System and the New York City Pension Fund, move, on behalf of themselves and the Class, for (i) approval of two settlements, one with Cendant Corporation and the HFS Individual Defendants named below,

and one with Ernst & Young LLP ("E & Y"), and (ii) approval of the Plan of Allocation of the Net Settlement Fund. The Cendant settlement provides for a payment to the class of $2,851,500,000 in cash, provides for additional payment to the class from Cendant and the HFS Individual Defendants in the event they recover damages in their suits against E & Y—50% of any recovery—and imposes certain corporate governance changes on Cendant Corporation. The E & Y settlement provides for a cash payment of $335,000,000 to the class. The Court having conducted a fairness hearing, heard the argument of counsel for Lead Plaintiffs and counsel of objectors, and having now expressed its reasons in the accompanying Opinion:

It is on this 14th day of August, 2000,

ORDERED that the Cendant settlement in the amount of $2,851,500,000 and 50% of any recovery by Cendant and the HFS Individual Defendants against E & Y, plus corporate governance changes detailed in the Settlement Agreement, is approved; it is further

ORDERED that the E & Y settlement in the amount of $335,000,000 is approved; and it is

ORDERED that the Plan of Allocation of the Net Settlement Fund is approved.

value of zero or less, the value is reset to .67 of net book value.